# Richmond

## J. B. HANCOCK V. JESSIE G. ANDERSON.

March 16, 1933.

Present, All the Justices.

The opinion states the case.

*Virgil R. Goode* and *Christian & Barton,* for the plaintiff in error.

*Parrish & Butcher, William J. Parrish, Jr.,* and *Charles U. Williams, Jr.,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

Under review is a judgment for damages which rests upon an alleged breach of trust and confidence.

Mr. Ira L. Anderson, father of Miss Jessie Anderson, was a citizen of Richmond and died in 1924. He did business with the Mechanics and Merchants Bank, and in 1923 placed with it for collection notes, the face value of which was $12,000. He had given these notes to his daughters, Miss Jessie Anderson and Miss Ruth Anderson. The proceeds, as collected, were to be credited to their several accounts in that bank. They were secured by a trust deed on what is known as the "Green House Property," and were executed by its owner, their brother, Edward C. Anderson, from whom, for some reason not germane to. this litigation, they had been estranged.

Identical actions were instituted by these daughters at the same time and in the same court, and it was stipulated by counsel that they were entitled to the same recovery, if any. These actions were tried together; the same evidence was considered in both cases; the same rulings made; the same instructions given, and the same verdict entered; and they must stand or fall together.

J. H. Patterson was the active vice-president of this bank, and had been their father's friend. They were women of limited business experience, and went to him for advice

about their estate and the manner in which it should be invested. He suggested the purchase of certain real estate bonds. These were bought. Hereafter, for convenience, we will deal with Miss Jessie's suit alone. She then asked him should she, if the occasion arose, thereafter consult with him about like purchases or should she see Mr. Hancock, the bank's cashier, and was told that she might see him, that he would do just as well, and on this advice all of her later dealings were with Mr. Hancock. She bought other securities from the bank, "bought numerous bonds there—not so many." Some of these the bank itself owned and some it sold for outside parties. She also bought bonds during this time from the State-Planters Bank and Trust Company, and from the American Bank and Trust Company. Certainly, on one occasion, on her own judgment, she declined to buy a bond which Mr. Hancock recommended. They kept a running account at this bank and a checking balance which usually ran from $300 to $500, and went there as did other customers. Her dealings, as we have seen, were with the cashier, Mr. Hancock. She said that she regarded Mr. Hancock as a bank official rather than as an individual, and would have continued to deal with the bank had he left it. Miss Jessie's share of the notes deposited was $6,000. On them her brother paid $2,000 and interest, but in 1928 he found himself unable to make other payments and asked for renewal of his notes.

"Mr. Hancock told me my brother would like to renew the notes as he found it difficult to pay them. He thought after three years he could be in a better position to pay them, and I told Mr. Hancock to go ahead and renew them.

"Q. Who did you understand Mr. Hancock was acting for in that transaction?

"A. For the bank."

This suggestion and request, which came from the brother, Hancock thought well of, advised compliance, and the notes were renewed. In 1929 she became anxious and went again to see Hancock who told her that the property

was valuable, that she had a first mortgage on it, but that it was also covered by a second mortgage and in case of a sale her debt would be taken care of. Interest was still in default. In answer to her inquiries he said: "No, he hasn't paid anything. We are going to sell him out." "The second mortgage man hasn't told me yet, but I know he is going to tell me to do it." From time to time like inquiries were made and like answers given. In March, 1930, he told her that the second mortgage man was willing to pay her overdue interest, and said that if she would accept such a payment it would put off the sale. This she was willing to do. Only one interest note was paid. On March 23, 1930, in answer to a telephone call, she again went to see Hancock when this conversation occurred:

"A. When I went in there Mr. Hancock was busy. In a few minutes he came up and said, 'Well, the second mortgage man is not going to sell your brother out and says if you sell him out he is not going to bid it in, so if you sell him out you will probably have to take it in because the way conditions are now I doubt if you can get a bid on it. I asked him what he would give you ladies for the notes.'

"Q. Mr. Hancock said he asked the second mortage man?

"A. Yes,—'and he intimated he would give you $8,000.' I said to Mr. Hancock, 'Well, if we accept that what will the man do then? Will he sell my brother out?' and he said, 'I don't know.' Then he said, 'Let me think a minute.' He sat on the top of the desk or table, whatever you call it, and said, 'Let me think,' and said, 'He has asked you something; suppose you ask him something.' He said, 'Suppose I ask him if he will give your brother the use of the greenhouse for one year without interest and pay you $8,000,' and I didn't say anything. I came home and I saw Mr. Kemp and I told Mr. Kemp."

Hancock also said: "The second mortgage man is not going to sell your brother out. He has decided to take his loss. If you sell it he is not going to bid it in and you will probably not get a bid on it and you will probably have

to take it yourself," and that he wanted to give her time to think the matter over. He then told her that he was trustee in the second mortgage, "and couldn't advise us in any way about it."

Mr. George S. Kemp was a friend of the family, a business man of wide experience and trustee in the first deed of trust. To him she went for advice. He, in the meantime, had been told by Edward Anderson that he had actually deeded this property to Hancock himself. Hancock, on the other hand, was proceeding as if Anderson was still the owner. In the confusion thus created Kemp did not know what to do, and suggested that she consult a lawyer. That advice was not followed. On Friday, following the interview of March 23rd, Hancock called up Miss Jessie and asked her what they had decided to do. She told him they had made no decision and he then told her to call up Mr. Kemp and ask him. In the course of her conversation with Mr. Kemp she told him that she could not take over the greenhouse herself. Kemp told her of her brother's claim. He tried in vain to secure an advance offer of $9,000. Finally, on Saturday, with Miss Jessie's advice, Kemp 'phoned from her home to Hancock that they would take the $8,000 offer, and on Monday, March 30th, the sale was completed at the bank. Miss Anderson in a note addressed to the bank, authorized sale at the price stated, and at the same time Hancock delivered the following certificate:

"RICHMOND, VA., March 30, 1931.

"This is to certify that I hold a letter from the holder of certain second mortgage notes of Edward C. Anderson secured by deed of trust on his property at Forest Hill, Richmond, Virginia (Green House property) instructing me to cancel the order to sell said property at auction and also stating that he will not sell at auction said property for one (1) year from date and that no interest will be charged Edward C. Anderson on the first or second mortgage for one (1) year from date.

"J. B. HANCOCK, Trustee."

Miss Jessie said that within a few days thereafter she for the first time ascertained that, in the deed which her brother gave, Hancock had assumed the payment of her note, which deed she understood he had destroyed.

Miss Jessie is not entirely clear in her statement as to the capacity in which Hancock acted. At one time she said she thought he was acting for her, at another that she knew he was trustee for the second mortgage man but thought that he would be fair to her. Again she said that she did not look upon him as her agent.

These statements appear in the testimony: "He told us he was trustee for the second mortgage man and couldn't advise us in any way about it." "He said he was trustee for the second mortgage." "Q. You knew that Mr. Hancock was acting for him (second mortgage creditor), didn't you? A. Naturally he would be. He was his trustee." "I don't know whether he was acting for him or not. I suppose he was." Hancock told her: "We are going to sell him (Anderson, the brother) out." Finally, on re-cross-examination, Miss Jessie said: "I don't suppose I thought anything about his acting for one or the other because I thought everything would be all right that was taking place there in the bank. It never once occurred to me that anything could go wrong in the transactions I had with the Mechanics and Merchants Bank." Hancock, who had told her that he could not represent her, suggested that she consult with Mr. Kemp.

The foregoing statements rest upon the evidence of the plaintiffs, Miss Jessie and Miss Ruth, but in the main upon the testimony of Miss Jessie.

As we understand it, the substance of the claim which these ladies make is that when they sold their notes to Hancock at a discount, he had already assumed their payment, and did not disclose to them that he was in any wise personally liable therefor.

From the testimony of Edward Anderson, the brother, it appears that his notes, which he had renewed in 1928,

and which were to mature in May, 1931, were still outstanding, and that he was unable to pay interest as it accrued. Mr. Hancock, who apparently represented both the first and the second mortgage debts had become importunate. Anderson was at his rope's end. Finally Hancock asked him how much he owed, and was told that it was somewhere between $1,500 and $1,600, but promised to bring, and did bring an itemized statement on September 13, 1930. It showed assets other than real estate valued at $2,867.45, and debts other than trust debts amounted to $2,560.67. But before this Anderson asked Hancock if he would accept a deed to his home and greenhouse. Hancock said that he would and agreed to have it prepared. This was on the 29th of September. On the afternoon of the next day Anderson went back to the bank, taking with him his wife. Hancock was there and with him a Mr. Dietrich, a notary public. A deed had been prepared and Anderson read it over. He objected to some of its conditions. His wife then suggested that they wait a while and think the matter over, but Hancock, striking the desk with his fist, said that if they did not sign at once he would advertise their property for sale on the morrow. They did sign and acknowledged the deed. It bears date of September 30, 1930, and in consideration of $10 conveyed to Hancock the Anderson home and greenhouse, subject to three trust deeds, one from the grantor and his wife to George S. Kemp, trustee, of date February 15, 1923, one from said grantors to the American Trust Company, trustee, dated December 8, 1923, and a third from said grantors to the American Trust Company, trustee, dated January 13, 1926. In that deed Hancock agreed to assume, become chargeable with, and pay off all of the obligations secured in said three trust deeds. After its execution Anderson asked for his notes. Hancock said they were locked in the bank vault and could not be gotten out till next morning, and offered to let Anderson keep the deed until the notes were surrendered; but Anderson said that this was not necessary,

and so the deed was left with Hancock. Anderson went back next morning for his notes but did not get them. Hancock said that he would hold the deed from record for a while for fear that other creditors would institute bankruptcy proceedings. Anderson continued to live in his old home, as tenant, and to look after the greenhouse as caretaker. Hancock thereafter treated him and dealt with him as such, and he knew nothing to indicate that there was any trouble until Kemp told him that Hancock was threatening to sell this property if his sisters were unwilling to take $8,000 for their notes. That, as we have seen, was some time late in March, and it was somewhere about Easter of that year that Hancock told Anderson that he was unwilling to accept the deed and had destroyed it. Anderson expressed surprise, saying that there had been an absolute conveyance, to which Hancock replied, that "if that is your attitude" then "I am just sunk." "Your sisters are suing me for $3,000." Mrs. Anderson has testified to the same effect.

Mr. Kemp said that somewhere about March 18, 1930, Miss Jessie Anderson asked him over the telephone to call upon her. This he did on the 20th. She told him that she was in trouble about her brother's note; that Mr. Hancock said the second mortgage creditor was dissatisfied and was going to sell the property, but would not protect her debt. Hancock did think that this creditor would purchase her note and her sister's for $8,000, but that such a price would entail a loss of somewhere about $3,000. Miss Jessie did not want to buy in the greenhouse and Kemp did not think it was wise for her to do so. He then undertook to secure an advance offer of $9,000 from Hancock but without avail. He then told Hancock that he would think the matter over and would advise him later. About a week later Hancock 'phoned to him to know if any decision had been reached, was told that it had not, and it was agreed that the matter should lie over until the following Tuesday. Kemp then went to see Miss Jessie and told her what had

been done. She again expressed herself as unwilling to buy in the greenhouse, and Kemp said that if she did so it would be a stone about her neck. He told her of his talk with her brother who said that Hancock himself was then the owner of the property, and that he had delivered to him a deed, as yet unrecorded. Kemp asked him why it had not been recorded and he answered, "I don't know. Beverly Hancock said he wouldn't accept it and I don't know what to make of it." The result of this conference was that both Kemp and Miss Jessie thought it was best to accept the Hancock offer. He then 'phoned to Hancock and did accept it. Kemp was asked for whom Hancock was acting and said that he did not know, but that "Edward told me he was acting for himself." Although Kemp did not know for whom Hancock was acting, he knew that he was not acting for the Anderson ladies but for an adverse interest. He (Kemp) did represent them, and these facts were recognized by both Hancock and Kemp in their dealings with each other.

Kemp thought the property was worth more than $8,000, but he doubted if it would bring enough to pay the Andersons, if sold under the mortgage.

Hancock testified on his own behalf. He had an arrangement with Mr. Leo Ullman, a business man of Richmond and a director in his bank, under which they purchased from time to time, at a discount, second mortgage notes. He attended to all the details of such transactions but supplied no funds. That Ullman did. The profits of their undertakings they divided share and share alike. There was a special account kept in their bank under the style of Bevman & Co., and through it all of the financial transactions incident to the purchase of these second mortgage notes went. Ullman owned the second mortgage Anderson notes. If the mortgage property had been sold and had brought less than the first mortgage debt or only enough to pay that debt, then Ullman's second mortgage notes would have been worthless; only an excess over the first

mortgage could be applied on the second. It was therefore to Ullman's interest, and through him it was to Hancock's interest, to reduce the amount due under the first mortgage. This is his account of statements made by him to the sisters:

"They came down there and I told them I had instructions from the second mortgage man to sell Anderson's property at auction, and that he had told me in discussing the matter that he didn't believe he would protect the first mortgage; that he didn't think that property was worth the first and second mortgages and he believed he would rather lose his $2,500 than to protect $11,000; that the greenhouses were obsolete; that real estate had gone down so that he just didn't feel at that time that he would bid it in, but might as well get the matter settled and go on and advertise it for sale and if didn't anybody else bid sufficient to protect it he didn't think he would. I told them all that. I also told them that they had stated in a number of cases to me that they didn't want to sell their brother out; that they didn't want the greenhouse property; if he couldn't make any money out of it they certainly couldn't, and that they thought if they sold him out it would just aggravate matters that were already at a very high pitch. They told me that several times. I called attention to that at this conversation. I said, 'Now I have a proposition that I want to submit to you ladies. I haven't even spoken to the second mortgage man about it. I just want to make this proposition and if you all decide to accept it I will go to him and I think he will agree to carry it out.' I said, 'Now I want you to understand this thing thoroughly. My only object—my main object in doing this is to make that second mortgage better, that the property might bring around $10,000 or $11,000 if we hold it several years.' Miss Jessie Anderson turned to me and said, 'What would you advise?' I said, 'I can't advise you in this matter as I have told you I am representing the second mortgage man and therefore I can't give you any advice. You will have to go somewhere else and get your advice in the matter because I am interested in it.'"

Relative to the deed in controversy, Hancock said that it was understood that the property was to be deeded to him, that he might offer it to the note-holders and thereby prevent a trustee's sale; and that it was not to be accepted until Anderson's outside indebtedness had been ascertained. When this was ascertained it was shown to be so large that an acceptance was deemed impractical; that bankruptcy proceedings might be instituted and his whole scheme set aside; that it was not accepted; and that Anderson knew it was not accepted, and simply left the deed with him where it remained pigeon-holed for a time and was afterwards torn up. He further denied having exercised any actual ownership under it.

Mr. Dietrich is a teller in this bank. He said that the Misses Anderson were in the bank during the latter part of March. They sat near the vault. Mr. Hancock was standing by them. He had occasion to go into the vault himself and passed near where these ladies were seated. He was asked what he heard, and answered: "In going back into the vault I heard Miss Jessie Anderson ask Mr. Hancock, 'What would you advise me to do?' and Mr. Hancock replied, 'I am not in a position to advise you. If you came to me as your banker I would advise you not to accept it.' "

Fraud must be established by clear and compelling evidence, but a jury has held that it is established, and we are bound by it if it is substantially supported.

When we undertake to say what a witness has testified to, even on a demurrer to evidence, we must look at all of his testimony. If that were not true, the right to cross-examine would be worth just less than nothing. A man might make out a case on direct examination, and on cross-examination concede that his story was a fabrication. Of course, we could not sustain a verdict for him by pointing to his first account of the transaction. *Norfolk & Western Ry. Co.* v. *Holmes,* 109 Va. 407, 64 S. E. 46.

What relations of trust and confidence have been established?

■ Miss Anderson, on the advice of the bank's vice-president, did business with the bank through its cashier, Hancock, and in that way purchased "numerous bonds— not so many," and she, during the same period of time, bought bonds from at least two other Richmond banks. Such transactions occur every day by unnumbered persons with unnumbered banks. Certainly their advice is not always sound. They themselves make bad investments, as has been made distressingly plain by the long story of bank failures. In the main, they are conducted by men of standing with proper standards of fair dealing. That customers should be permitted to consult them, and that they should be permitted to advise their customers without peril to themselves, is demanded by public policy. Bankers are not infallible, but they are an improvement on crystal-gazers, and we should be slow to deny to them the right to give to inexperienced customers the benefit of such expert knowledge as they may have. They are not to be held accountable for errors in judgment but only for betrayals of trust.

■ The suggestion in 1928 that these notes which then fell due should be renewed for three years came, not from Hancock, but from the brother. The brother could not then pay, and these sisters had as a practical proposition to renew their notes or to enforce them. The second alternative they were reluctant to adopt.

It is also true that Hancock and his associate, Ullman, one of the directors, bought from time to time, at discount, second mortgage notes. There was nothing reprehensible in this, nor in Hancock's failure to make public his interest in such transactions. Certainly they did not touch the plaintiff.

When we come to the particular transaction in judgment, we find that Hancock repeatedly said to Miss Anderson that "we are going to sell him out." She was not undertaking to sell him out, and so this statement carried with it necessarily the suggestion that he had some other interest

in mind. She knew that that interest was coupled with the claim of the second mortgagee.

Edward Anderson was insolvent. Interest was creeping up; the value of the security was diminishing. Ullman was not willing to invest there more money, and so it was either necessary for him to secure the first mortgage notes at a discount or to lose what he had already invested. Hancock would have had to suffer no part of such a loss, but on the other hand he would have failed to realize any profits, and so it was to his interest also to see that the first mortgage debt was reduced. It was then that he told Miss Anderson that he could not represent her. The conclusion that he did tell her this is inescapable. Miss Ruth Anderson has testified to it; Mr. Dietrich has testified to it, and Miss Jessie has in substance admitted it. She said that, when in answer to an inquiry she told Hancock that she was undecided, he told her to "call up Mr. Kemp and ask him." That he should have advised her to consult with one of the most alert business men of Richmond is out of keeping with any purpose to defraud. She did consult with Mr. Kemp, who had himself talked with her brother. Her brother was insolvent. She did not herself want to sell him out, nor did she want to buy the greenhouse. She said so. And Mr. Kemp told her it would be "a stone about her neck." In these circumstances she chose what appeared to be the lesser of two evils. That Mr. Kemp did represent her in his dealings with Hancock is too plain for argument, and it is likewise plain that they dealt together on the theory that Hancock's interest was adverse, or, in any event, that he represented an adverse interest.

The jury's verdict is to the effect that there was a delivery of this deed, and by it we are bound; but that does not affect the fact that plaintiff herself knew about it before the 30th of March, 1931.

It is certain that long before the sale of these notes Edward Anderson knew that Hancock claimed not to have bought the greenhouse. He told Kemp about this, and

Kemp told the Misses Anderson. All of this was before the transaction was closed. Indeed, this is what Kemp advised the plaintiff to see a lawyer about. That advice, however, as we have seen, they did not follow, but on their own judgment closed the transaction.

It is also true that in this deed which the jury has held was delivered, Hancock assumed the payment of plaintiff's debt. The situation was one of doubt; even the brother has said that he did not know where he stood. It was, therefore, to Hancock's interest that the $8,000 offer be accepted and his contingent liability cancelled; but he was under no obligation to disclose this difficulty to the plaintiff. He had told her that he could not represent her, had advised her to seek the advice of others, and that advice she followed, talked with Mr. Kemp and acquiesced in his judgment. If it were to be conceded that relations of trust and confidence had theretofore existed, they certainly did not exist here. It cannot be that because relations were once confidential the parties are for ever afterwards debarred from dealing with each other at arm's length. It is perfectly true that during all of this time she had the utmost confidence in Mr. Hancock, but she was a stranger to him in this particular dealing. We deal every day with men in whom we have confidence, but if we deal with them as strangers our attitude of mind can make no difference.

■ That principle upon which plaintiff relies is well stated in *Leedom* v. *Palmer*, 274 Pa. 22, 117 Atl. 410, 411: "Confidential relation is not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible."

■ Trust alone, however, is not sufficient. We trust most men with whom we deal. There must be something

reciprocal in the relationship before the rule can be invoked. Before liability can be fastened upon one there must have been something in the course of dealings for which he was in part responsible that induced another to lean upon him, and from which it can be inferred that the ordinary right to contract had been surrendered. If this were not true a reputation for fair dealing would be a liability and an unsavory one an asset. A sale of bonds made by the Bank of England can be set aside no more quickly than a sale made by a "bucket-shop."

In *Southern Trust Co.* v. *Lucas* (C. C. A.) 245 Fed. 286, 288, the court, in the course of its opinion, said: "It is true that one party cannot create a legal obligation or status by pleading ignorance and inexperience to an opposing party in a business transaction. Those who have in the law's view been strangers remain such, unless both consent by word or deed to an alteration of that status. The communicated desire or intention of one to impose upon the other a different status, involving greater obligations, is ineffective, unless the other consents to the changed relation. It is true that consent may find expression in acts as readily as in words. But such consent cannot be implied from a bare procedure with the transaction, after one party has declared his or her inexperience and reliance upon the other. The knowledge of this state of mind in a party may be an important consideration in determining the existence of fraud, as indicating what effect might be anticipated from statements made; but it cannot establish a confidential legal status."

 "Friendly relations or even intimacy of relationship present an entirely different question from what is understood as a confidential relation in law. One may have confidence in another's integrity and honesty of purpose, and likewise believe that he will live up to any of his contracts, without having any confidential relations with such person that would void any agreement or transactions entered into between them, on the theory of constructive

fraud or undue influence. We think the record shows that the Harrises did have confidence in the honesty and integrity of the Jacksons, and believed that the Jacksons would comply with any agreements into which they entered; but there is absolutely no testimony showing anything further, or that there were any confidential business relationships, or relationships existing between the Jacksons and the Harrises which would constitute a basis for a charge of constructive fraud. There must be something further than mere confidence in another's honesty and integrity to sustain the presumption of constructive fraud." *Jackson* v. *Gorham,* 98 Cal. App. 112, 276 Pac. 391, 393.

In that case there was an active misrepresentation of material facts, and the plaintiff was permitted to recover.

In Pomeroy's Eq. (3d ed.) section 902, it is said that when a contract is not in its nature essentially fiduciary, a trust, to be established, must be *expressly* reposed or *necessarily* implied.

We do not for a moment doubt the fact that Miss Anderson trusted this bank and its cashier, Hancock, just as she trusted two other Richmond banks from which she bought bonds. But that is not enough.

It is said that a man cannot be at once agent for a buyer and seller, that loyalty to his trust is an elementary duty, and that where confidential personal relations exist a full and fair disclosure is imperative.

In support of these propositions, *Williams* v. *Bolling,* 138 Va. 244, 121 S. E. 270, is cited and relied upon. In that case a broker who advised a sale of certain stock and who was authorized to sell at a certain price, purchased a part of that stock himself. He also advised the purchase of certain bonds, and sold bonds which he had. The court held the contract voidable. There was here no question of agency; it was conceded in the instant case that Miss Anderson said that she did not look upon Hancock as her agent. *Ferguson* v. *Gooch,* 94 Va. 1, 26 S. E. 397, 40 L. R. A. 234, is also a case of agency, as is *Cardoza* v. *Immigra-*

*tion Co.,* 116 Va. 342, 82 S. E. 80. Many other Virginia cases reaffirm the rule that an agent must have no interest adverse to his principal.

The presumption is that people who deal with each other, grown men and women, deal with each other as such, and this presumption is not destroyed by disparity in age nor by the ties of blood, and this is particularly true where a fraud is charged, either actual or constructive. *Moore* v. *Gregory,* 146 Va. 504, 131 S. E. 692.

Without prolonging this discussion, we conclude by saying that within the purview of legal definitions Hancock held no post of trust and confidence; and if he ever stood in such relationship, he did not in the instant case. He told Miss Anderson that he represented adverse interests, and advised her to seek counsel elsewhere, and particularly to consult Mr. Kemp, a citizen of outstanding character and ability. She did consult him and took his advice. It may be said in passing that we are not prepared to say that it was not good advice, for while this property was probably worth more than the sisters' debts, they would doubtless have had to buy it in at a forced sale. The greenhouse business had led their brother into insolvency, and there is no reason to believe that they would have been more successful in its management.

In this action plaintiff asked for a joint and several judgment against J. B. Hancock and the Mechanics and Merchants Bank. At the conclusion of the testimony the court struck out all the evidence as to the bank, but permitted the case against Hancock to go to the jury, which returned a verdict against him, duly confirmed, in the sum of $1,500, with interest from August 4, 1931. The motion to strike might well have been entertained as to both of these defendants; indeed, the bank, for its services, received some compensation. Hancock took nothing except his salary as cashier. Such services as he rendered to the plaintiff were gratuitous.

The judgment against Hancock must be reversed, the verdict set aside, and the case dismissed. It is so ordered.

*Reversed.*

BROWNING and CHINN, JJ., dissenting.