BUFFUM, TRUSTEE IN BANKRUPTCY, *v.* PETER BARCELOUX CO.

No. 564. Argued March 20, 21, 1933.—Decided April 10, 1933

*Messrs. Horace B. Wulff* and *George R. Freeman,* with whom *Messrs. Robert T. Devlin* and *Wm. H. Devlin* were on the brief, for petitioner.

*Mr. Arthur C. Huston,* with whom *Mr. Stephen W. Downey* was on the brief, for respondent.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

In April, 1926, the bankrupt, Henry Barceloux, was the owner of 2500 shares of the Peter Barceloux Company, a quarter of the capital stock. The other three quarters were owned, one by his brother George, one by his sister Cora, and one by three nephews, the sons of a deceased

brother. The book value of the bankrupt's shares was over $90,000, and the actual value over $94,000, but the shares were not traded in, and had no current value in the market. The business was a family affair, and strangers were not welcome within the family preserve.

A time arrived when the unwelcome stranger seemed likely to break in. The family combined to maintain its solidarity and keep the intruder out. Henry Barceloux had become heavily involved in debt. A former partner, Freeman, had recovered a judgment against him for nearly $50,000. Freeman had been lenient, but Freeman was now dead, and the administrator was asking for security as the price of delay. There were other creditors too, though they are not shown to have been importunate. With these intruders visible, the family set out to build protective barriers. There is testimony that Henry Barceloux was indebted to the corporation in upwards of $33,000. On April 27, 1926, he secured part of this indebtedness by a pledge of 2499 shares of the Barceloux stock. The agreement was in writing. We are assured by the family that it was confirmatory of an oral agreement made some years before, but the testimony as to this is not persuasive, and might, not unreasonably, be rejected by the trier of the facts. The movement of events was swift thereafter. The Freeman administrator had still to be placated. He was put off in June, 1926, with an assignment of the equity in the Barceloux shares together with an assignment of an interest in heavily mortgaged lands. He gave notice to the corporation of his interest in the shares and made demand upon the secretary for a statement of the indebtedness secured by the superior lien. He also asked for an agreement that the corporation give him notice of ninety days before enforcing its security. His activity aroused the family to new measures of protection. The request for notice was

refused, and the defensive barrier extended. Henry Barceloux was then the owner of shares of stock in other corporations, his ownership till then being clear of any lien. On June 29, 1926, he pledged his interest in these shares (worth about $2158) as additional security for the family debt. In so doing he stripped himself of the control of all or nearly all his unincumbered assets. On the same day, or perhaps a few days later, the corporation canceled the certificate for 2499 shares which was in the name of the pledgor, and took out a new certificate in its own name as pledgee.

The scene was now ready. The time for action was at hand. On August 16, 1926, there was the gesture of a public sale. A printed notice had been posted on a telegraph pole and perhaps elsewhere. There was no other notice either to Freeman or to any one else. At the appointed time, the members of the family, accompanied by a lawyer, went through the form of an auction on the steps of the court house. The debtor's sister, Cora, who was a director of the corporation, read the notice of sale and asked for bids; all the collateral, both the Barceloux shares and the others, being offered as a single lot. The brother George, who was then the president, made a bid for the entire lot in the name of the Barceloux corporation, the bid being for the amount of its claim against the debtor and a fee for its attorney. No sooner had the corporation bought than it sold back again to George. In payment for what it sold, it took his promissory note with a pledge of the shares as collateral security. About two years later, it canceled the resale, gave back the promissory note and thereafter held the shares as owner. In the meanwhile a few scraps of property retained by Henry Barceloux had been put out of his name. He still held one share in the Barceloux Company. He sold it to his sister. He had equities in other properties, lands and shares of stock. He sold part to his sister and part to his

wife. The value in each instance was in excess of the price. The equity in collateral pledged with a bank in San Francisco went to the Barceloux Company, which assumed the payment of the debt. All that was then left to him was his office furniture and fixtures, and this he transferred to his attorney. By October, 1926, he had stripped himself of everything. He waited four months, and became a voluntary bankrupt.

The trustee in bankruptcy has brought this suit under § 70 (e) of the National Bankruptcy Act * to recover from the Barceloux Company the value of property pledged by the bankrupt with fraudulent intent. At the filing of the bill the company had resold the shares to George Barceloux, its president; and the prayer for relief, adapting itself to the situation then existing, was for the value of the shares on August 16, 1926, with interest at 7%, the statutory rate of interest in the state of California. There was also a prayer for an accounting and for any other relief consistent with equity. The District Court found that the fraudulent intent had been made out; that both pledgor and pledgee were sharers in it; and that there should be an appointment of a master to take and state an account and to report the value of the property covered by the pledge. Upon the coming in of the report, there was a final judgment for $106,409.44, with costs, in favor of the trustee. 51 F. (2d) 80.

An appeal by the defendant followed with the result that the decree was reversed, one judge dissenting. 61 F. (2d) 145. The Court of Appeals held that the Freeman

---

* "The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a bona fide holder for value prior to the date of the adjudication." National Bankruptcy Act, § 70 (e), July 1, 1898, c. 541, 30 Stat. 565; 11 U.S. Code, § 110.

administrator was estopped from contesting the validity of the pledge by reason of the fact that he had accepted a pledge of the equity in the shares, subject by its terms to the pledge already made. Finding no sufficient evidence that other creditors were aggrieved, it refused to pass upon the question whether the pledge as to them was good or bad. It held, however, that the sale under the pledge had not been fairly made, and that a resale should be ordered. Upon the argument the defendant had made profert of the Barceloux certificate, and had left it with the court to be disposed of in any way consistent with equity and conscience. The shares in other corporations it could not produce, having disposed of them again. The court held that there could be no recovery of the value of the Barceloux shares in view of the willingness of the defendant to submit to a resale. Judgment was therefore ordered that the shares be resold under the direction of the court of bankruptcy; that out of the proceeds the Barceloux Company be paid its indebtedness with interest (less the value of the shares that it was unable to surrender); and that only the surplus, if any, be paid to the trustee. A writ of certiorari brings the case here.

█ The evidence sustains the finding of the District Court that the pledge to the defendant was made in fraud of creditors.

More is here than a mere preference. If that and nothing else had been intended, the pledge would be proof against attack, for it was made more than four months before the bankruptcy petition. But in truth there was much besides. The pledge was a step in a general plan which must be viewed as a whole with all its composite implications. *Dean* v. *Davis*, 242 U.S. 438, 444; *Coder* v. *Arts*, 213 U.S. 223, 224. The principal assets of the debtor were his certificates of stock in the family corporation. There was to be a delivery of these certificates as security for an indebtedness much less than the value of

the collateral deposited. There was to be a delivery of other security to make sure that all the assets of the debtor, not otherwise incumbered, would be within the control of the pledgee. There was to be a sale so secret that none of the creditors would be likely to know anything about it, with the result that other bids would be forestalled, and embarrassing inquiries as to preferences averted. Finally, to make the job a thorough one, the odds and ends of other assets were to be conveyed to friends or relatives. As the outcome of these manoeuvres the Barceloux Company canceled an indebtedness of about $33,000, and became the owner of stock certificates worth triple that amount. The unconscionable sale is not to be viewed in isolation, as something disconnected from the pledge, an accident or afterthought. It was the fruit for which the seed was planted, or so the trier of the facts might look at it. The Barceloux Company set out to do something more than secure the payment of a debt. It became a party to a plan to appropriate a surplus and in combination with its debtor to hold his creditors at bay. *Dean* v. *Davis, supra; Shapiro* v. *Wilgus*, 287 U.S. 348. So the District Judge interpreted the transaction, viewing the events consecutively as stages of an unfolding plot. We discover no sufficient reason for rejecting his conclusion. Indeed the Circuit Court of Appeals held nothing to the contrary. It refrained from approving or condemning the purpose of the pledge, being led to that course by the application of the doctrine of estoppel. The finding therefore stands.

■ The trustee is not subject to the bar of an estoppel in his effort to undo the fraud.

The argument for the defendant is that the Freeman administrator is estopped by force of his acceptance of a junior lien upon the shares, and that the trustee as his champion enjoys no better right. To overcome the supposed estoppel it is enough to recall the fact that at the

time of the unlawful pledge the Freeman administrator was not the only creditor. The uncontradicted evidence is that there were many other creditors whose claims are still unpaid. What the trustee recovers will be for the benefit of all. *Moore* v. *Bay,* 284 U.S. 4.

The result would not be different, however, if the administrator stood alone. Neither in his own name nor indirectly through the trustee is he building any rights upon the pledge or claiming any preference over others. He has rejected the security, and claims as a general creditor. There may have been obscurity as to this at the beginning of the suit. The bill of complaint which was a declaration by the trustee, and not by the administrator, gives recognition to the junior pledge as valid and subsisting. There has been no obscurity, however, since the trial and the interlocutory judgment. The pledge to the administrator is disregarded, and he is left in the same position with reference to any general creditors as if the transaction putting him ahead of them had been undone from the beginning. One who takes a mortgage or an assignment of an interest in property subject to a specific lien may be estopped while he retains the benefit from disavowing the attendant burden. *Freeman* v. *Auld,* 44 N.Y. 50, 53; *Matter of Oakes,* 248 N.Y. 280, 284; 162 N.E. 79. He either takes the security upon the terms conditioning the offer, or does not take it at all. The basis for an estoppel is cut away if the transaction is lawfully disaffirmed and the security abandoned. *Old National Bank* v. *Heckman,* 148 Ind. 490, 507; 47 N.E. 953. Cf. *Bybee* v. *Oregon & Cal. R. Co.,* 139 U.S. 663, 682.

Disaffirmance and abandonment in this instance rested on sufficient grounds. The Freeman administrator, though informed of the fact that there was a pledge superior to his, had no knowledge of anything else. He was not informed of the circumstances essential to an

understanding of the fraud. He did not even know, so far as the evidence discloses, whether the pledge was new or old. Only through later events was the collusive plan exhibited in all its sinister significance. There can be no irrevocable estoppel when the truth has been withheld.

■ The repurchase of the certificates by the fraudulent grantee during the pendency of the suit did not make it error for a court of equity to render judgment for the value.

There is no occasion to consider what relief would have been proper if the certificates had been owned by the defendant at the filing of the bill, and had been continuously retained thereafter. We may assume, though we do not decide, that the trustee, suing in such circumstances for an accounting in equity, would have had the shares, and not the value. See *Dunphy* v. *Kleinsmith*, 11 Wall. 610; *Wasey* v. *Holbrook*, 141 App. Div. 336, 125 N.Y.S. 1087; 206 N.Y. 708, 99 N.E. 1119; and compare American Law Institute, Restatement of Law of Trusts, Tentative Draft No. 3, § 199, and cases cited, pp. 157, 158. The fact is, however, that at the filing of the bill, the defendant had assigned the certificates to another, who was not a party to the suit. The assignment is alleged in the complaint and admitted in the answer. Not till May 11, 1928, after the answer had been filed, did George Barceloux return his certificates to the defendant and thus reinstate its title. This being so, the suit in its inception was properly framed as one for money relief, the value of the shares at the time of the foreclosure of the pledge. There was no objection at any stage of the controversy that the case was triable by a jury. *Schoenthal* v. *Irving Trust Co.*, 287 U.S. 92; *United States* v. *Bitter Root Co.*, 200 U.S. 451. In saying this we do not intimate that the objection would have prevailed, if seasonably urged. There were entanglements that may have called for discovery and accounting,

at least in possible contingencies. The point will not be labored, for at the trial the defendant did not argue to the contrary (*Reynes* v. *Dumont,* 130 U.S. 354, 395; *American Mills Co.* v. *American Surety Co.,* 260 U.S. 360, 363; *Schoenthal* v. *Irving Trust Co., supra,* at p. 96); and does not even now. By common consent the suit was tried as one in equity, the fraudulent grantee being held to account as a trustee *ex maleficio* for the value of the shares which it had fraudulently acquired and then conveyed to some one else. *United States* v. *Dunn,* 268 U.S. 121; *Independent Coal & Coke Co.* v. *United States,* 274 U.S. 640, 647; *Newton* v. *Porter,* 69 N.Y. 133; *Hamilton National Bank* v. *Halsted,* 134 N.Y. 520, 527; 31 N.E. 900. A like recovery would have been permitted if the suit had been at law.

The defendant being chargeable with the value upon the filing of the bill, the question for us now is whether it could change its liability by buying back the shares. The answer is supplied by the opinion of Story, J., in *Oliver* v. *Piatt,* 3 How. 333, 401, a landmark in the law of trusts. The trustee who misapplies the subject matter of a trust becomes accountable at once for the proceeds or the value. Cf. *Hamilton National Bank* v. *Halsted, supra.* Nothing that he can do afterwards in buying the property back will affect that liability, except at the option of the beneficiary complaining of the wrong. " This right or option of the *cestui que trust* is one which positively and exclusively belongs to him, and it is not in the power of the trustee to deprive him of it by any repurchase of the trust property, although in the latter case the *cestui que trust* may, if he pleases, avail himself of his own right, and take back and hold the property upon the original trust; but he is not compellable so to do." *Oliver* v. *Piatt, supra;* and cf. *Bunnel* v. *Stoddard,* 4 Fed. Cas. 667, 683; *Miles* v. *Coombs,* 120 Maine 453, 455;

115 Atl. 249; *Burwell* v. *Burwell's Guardian,* 78 Va. 574, 582; *Bate* v. *Scales,* 12 Ves. 402; American Law Institute, Restatement of Law of Trusts, *supra.* Any other rule, it was said, would enable the wrongdoer to take advantage of his own wrong; to let the transaction stand, if the investment showed a profit and by aid of a repurchase to charge the beneficiary with an intermediate decline. Cf. *Barney* v. *Saunders,* 16 How. 535, 543. The standard of duty is no different whether the trust to be enforced is actual or constructive. *United States* v. *Dunn, supra; Independent Coal & Coke Co.* v. *United States, supra; Newton* v. *Porter, supra.* The implication of a trust is the implication of every duty proper to a trust. Equity has its distinctive standards of fidelity and honor, higher at times than the standards of the market place. *Meinhard* v. *Salmon,* 249 N.Y. 458, 468; 164 N.E. 545. Whoever is a fiduciary or in conscience chargeable as a fiduciary is expected to live up to them.

■ The ruling of the trial court whereby the highest value of the property up to the time of the decree was made the measure of the recovery was not harmful to the defendant.

The recovery would have been larger if the value at the sale with legal interest thereafter had been adopted as the measure.

■ The defendant may participate on the same basis with other creditors in the distribution of the assets.

The decree of the District Court is erroneous in so far as the claim of the defendant is postponed to those of others. *Moore* v. *Bay, supra.*

The decree of the Circuit Court of Appeals is reversed, and that of the District Court modified in accordance with this opinion and as modified affirmed.

*Reversed.*