**LAWRENCE v. MUTER CO. et al.**
(two cases).
Nos. 9484, 9485.

United States Court of Appeals Seventh Circuit.
Nov. 12, 1948.

Rehearing Denied Jan. 4, 1949.

Daniel J. La Mont and John J. Kennelly, both of Chicago, Ill. (Nash, Ahern & McNally, of Chicago, Ill., of counsel), for Lawrence.

Thomas Dodd Healy, Thomas G. Vent, Thomas G. Vent, Jr., and Vent & Vent, all of Chicago, Ill., for Muter Co., an Illinois corporation, and Leslie F. Muter, defendants-appellants and cross-appellees.

Before MAJOR, Chief Judge, and KERNER and MINTON, Circuit Judges.

MINTON, Circuit Judge.

The plaintiff, a citizen of Michigan, filed this action in equity against the defendants, Muter, a citizen of Illinois, and the Muter Company, an Illinois corporation, for breach of fiduciary relationship and fraud. From a judgment of $128,438.33 in favor of the plaintiff, the defendants have brought this appeal.

This litigation culminates a series of dealings between the parties commencing in April 1938. The undisputed evidence and the findings disclose that at that time and since 1923, the plaintiff owned and operated an unincorporated business manufacturing and selling radio coils and allied radio parts. The defendant Muter was president, treasurer, and director, and owned 97% of the 200,000 shares of outstanding stock of the defendant Muter Company which also manufactured and sold radio parts. Since late 1937 and as of March 31, 1938, the plaintiff was admittedly insolvent. The first contact between the parties took place in early April 1938 when the plaintiff discussed his financial condition with Muter and stated that his company was prepared to manufacture push button turners which could be remodelled to use Muter Company switches. A week later, Muter examined the plaintiff's plant and outlined in substance the terms on which he would give financial assistance to the plaintiff. The plaintiff then agreed that Muter's lawyer represent both parties. On May 17, the parties worked out in memorandum the details of a contract to be entered into by them, and on May 27, 1938, the contract, prepared by Muter's lawyer, after first being compared item by item with the memorandum, was duly executed.

Pursuant to said contract, Muter advanced $25,000 of which $15,626.66 was accepted in full liquidation of creditors' claims and the balance retained as working capital; a new corporation, General Manufacturing Company (hereafter called General) was formed with 5,000 authorized shares of which Muter took 3,000 and the plaintiff 2,000. The plaintiff immediately pledged his 2,000 shares with Muter; executed a power of attorney giving the latter full voting rights; and conveyed his business assets to the corporation. The corporation in turn executed a $25,000 chattel mortgage on all its assets to Muter, due in three years. The plaintiff, although nominally president, remained as a production supervisor of General at $50 a week, while Muter exercised full management and control.

In April 1939 Muter decided to move General to the first floor of the Muter Company plant and to consolidate the activities of the two companies. On April 21, 1939, the plaintiff received 2,000 shares of Muter Company stock and conveyed to Muter his 2,000 shares of General. Late in December 1939, Muter conveyed the 5,000 shares of General, which he now owned, to the Muter Company; the latter dissolved General; and a merger was effected. For the 5,000 shares of General, Muter received $25,000 in cash and 2,000 shares of Muter Company's hitherto unissued stock. At this point Muter received two things for his share in the assets of General, now merged into Muter Company, namely, the $25,000 in cash which he had advanced to salvage the plaintiff and his bankrupt business, and 2,000 shares of Muter Company, which is exactly the amount of shares in Muter Company that the plaintiff received. In these circumstances, it is difficult for us to see how Muter ever overreached the plaintiff as the court found, as we hereafter set

forth. The plaintiff continued as an employee of Muter Company. In June 1943 he was assistant sales manager with a drawing account against 5% of the net profits of the Muter Company. In late June 1943, the plaintiff asserted a claim to an additional interest in Muter Company. Muter then proposed to increase the plaintiff's compensation to $85 a week against ½% of the net sales of Muter Company, effective as of February 1, 1943, and the plaintiff agreed. On or about June 29, 1943, the plaintiff signed a release and received two checks totalling $5,631.02.

In February 1944, a reduction of his salary to .35% of net sales of Muter Company produced dissatisfaction in the plaintiff, and he then in May 1944 for the first time consulted an attorney of his own and began a series of letter demands on the defendant company, including an offer made on May 14, 1945, to settle his alleged claim for $50,000. On May 15, 1945, the plaintiff was discharged, and this suit followed.

From June 7, 1938, to and including the year 1945, the plaintiff received $63,713.83 from General Manufacturing Company and/or the Muter Company; including compensation $44,713.83; 2,000 shares of Muter Company (value at time of trial) $16,500; and dividends thereon $2,500. Muter Company's net profits before taxes in 1938 were $64,384.82 and in 1939 $20,494.98. They increased sharply in 1940 and 1941. Following conversion to war production, profits of the Muter Company for the indicated years were:

| | Net. Income Before Provision for Federal Income and Excess Profits Taxes and Reserve for Contingencies. | Net Income After Provision for Federal Income and Excess Profits Taxes and Before Reserve for Contingencies. |
| --- | --- | --- |
| 1942 | $ 404,058 66 | $107,818.54 |
| 1943 | 1,329,808.13 | 349,334.84 |
| 1944 | 1,153,224.10 | 312,767.83 |
| 1945 | 333,162.97 | 95,202.90 |

Since in our view the disposition of this case turns on the effect of the release executed by the plaintiff on June 29, 1943, it is necessary to detail in greater particularity the relations and transactions of the parties prior and leading up to the release. In October 1937, the plaintiff was without working capital or bank credit and on the verge of bankruptcy. He then sought through a credit agency to arrange a meeting of his larger creditors and consulted a firm of underwriters, upon whose advice he applied for a loan to the Reconstruction Finance Corporation. This application was turned down. In April 1938, a creditors' committee was formed, a meeting of the larger creditors was held, and appraisers were appointed. The latter found that the plaintiff's assets on a liquidating basis could not be valued in excess of $25,000, assuming that some $13,000 accounts receivable were one hundred per cent collectible. His debts were in excess of $39,000, upon which he was personally liable since as above stated his business was unincorporated. It was against this background that the plaintiff solicited Muter's financial aid in April 1938, and the parties entered into the contract partially described above.

▌ The plaintiff alleges in his complaint that Muter entered on this salvage operation as a result of a fraudulent scheme to deprive the plaintiff of his business. This allegation is without merit for the record clearly shows that Muter had never met the plaintiff before; and that their first contact was made solely on the initiative of the plaintiff who then fully realized that his business was virtually wrecked unless help was immediately forthcoming. Although the plaintiff was undoubtedly under a state of compulsion owing to his desperate financial condition and was in this sense coerced into the contract in question, it is well-settled that mere stress of business condition does not constitute duress where the defendant was not responsible for such circumstances. French v. Shoemaker, 14 Wall. 314, 81 U.S. 314, 20 L.Ed. 852; In Re Prima Co. (Harris Trust & Savings Bank v. Keig), 7 Cir., 98 F.2d 952, 965. It was pursuant to the specific terms and provisions of the contract worked out under the plaintiff's full knowledge and consent that Muter achieved complete domination and control of General.

▌ Our next inquiry relates to the exchange of stock made on April 21, 1939, after General had operated for almost a year with indifferent success and a plan was formulated to consolidate the two companies. This transaction was consummated

in accordance with the following provision in the contract: "(8) At any time hereafter, at the election of the party of the first part, said General Manufacturing Company, an Illinois corporation, may be and become consolidated with any company or companies which the party of the first part may select, on the basis of actual book value of the shares of stock of said General Manufacturing Company at such time, and upon such consolidation said party of the second part agrees that he will accept payment for the shares of stock then owned and held by him in said General Manufacturing Company, by exchanging same for such stock or securities in said consolidated company or otherwise, as may then be offered to him by the party of the first part, or to accept cash from the party of the first part in payment for his said stock at the actual book value of such shares of stock of said General Manufacturing Company at such time, as the party of the second part shall elect."

Under this provision, it would seem clear that in event of a consolidation which could be made at Muter's election, the plaintiff had two optional methods of receiving payment for his General stock: cash at the book value thereof or "such stock or securities in said consolidated company or otherwise, as may then be offered to him" by Muter. The second option is not so vague as to render the contract unenforceable, since if the plaintiff was dissatisfied with the securities offered to him, he could resort to the alternative of taking cash. Where at the promisor's option he may receive a benefit or subject the promisee to a detriment, there is sufficient consideration for the promise. Restatement of Contracts, Sec. 75; Williston, Treatise on Law of Contracts, Secs. 103F, 104, and cases there cited.

The plaintiff chose to take Muter Company stock.

Because, as we stated above, the principal question before us is the legal consequence of the release made thereafter, we shall not analyze the record in respect to this transaction, but shall assume instead the correctness of the finding below that "the evidence shows that Muter at that time (April 1939) fraudulently intended to acquire General Manufacturing Company to the detriment and exclusion of Lawrence." We shall further assume as the trial court found that at the time the exchange was made Muter promised the plaintiff that the 2,000 shares he had received were not in full payment for his interest in General but that the balance would be computed and paid on a later date; that on many occasions thereafter this promise was repeated; that Muter never did intend to perform his original promise and made the subsequent ones solely to lull and delude the plaintiff; and as the trial court must have inferred, that the exchange of stock was made in implementation of Muter's fraudulent scheme. On this state of the facts, the plaintiff would clearly have had a right to recover. Howard v. Howe, 7 Cir., 61 F.2d 577. And, although we have serious reservations as to the relative values of the two blocks of stock (see Lebold v. Inland Steamship Co., 7 Cir., 82 F.2d 351, 356) we shall not disturb the finding that the 2,000 shares of Muter Company stock received by the plaintiff in the exchange were an inadequate consideration. Inadequate consideration will not invalidate a contract but will supplement other evidence of fraud. Williston, supra, Sec. 115.

But it seems to us that however meritorious the plaintiff's claim or reprehensible the defendant's conduct may have been, the former was released and the latter forgiven by the letter which the plaintiff read, signed, and sealed on the date aforesaid:

"June 29, 1943.
"Mr. Leslie F. Muter, President
"The Muter Company
"1255 South Michigan Avenue
"Chicago, Illinois.
"Dear Mr. Muter:
"The question having arisen due to a misunderstanding between us, as a result of certain conversations, as to whether or not the 2,000 shares of stock in The Muter Company, an Illinois Corporation, which I received from you personally by assignment was in full settlement of all my interests in the Gen-Ral (sic) Manufacturing Company, an Illinois Corporation, I am writing this to assure you that I have no claim against you personally or against The Muter Company that has not already been liquidated

between us by an assignment to me of said stock and other good and valuable considerations.

"You may regard this letter as a valid and complete release to yourself personally and to The Muter Company of any and all liability arising out of the aforesaid transaction or for any liability implied by reason of any conversations between us concerning our business relations past and present.

"Yours truly,
"Virginia Carley,
"Witness.
"A. A. Dailey,
"Witness.

"S. O. Lawrence Seal
"VB"

■■ The language of this instrument is specific, non-technical, and unequivocal. Nothing is found in the record to indicate that the plaintiff could not read it, or that he executed it under fraudulent inducements, coercion, or duress. Although the plaintiff testified that he merely "glanced" at this instrument, it is the universal rule that he cannot thus evade his responsibilities for its terms and conditions. Chicago R. I. & P. R. Co. v. Hamler, 215 Ill. 525, 74 N.E. 705, 1 L.R.A., N.S., 674, 106 Am. St.Rep. 187, 3 Ann.Cas. 42. The plain meaning of the release is that the plaintiff accepts the 2,000 shares of Muter Company stock in full settlement of any and all claims against the defendants. The plaintiff's testimony that he released the defendants from all claims on Muter's promise to give him an additional interest, thereby retaining the very claim purported to be liquidated by the release, is a patent contradiction that we find impossible to reconcile. The written terms of the release must govern.

■ The plaintiff seeks to avoid the consequences of the release on the ground that it was not supported by consideration, invoking the rule that a discharge of an existing obligation or right of action by release requires consideration. Toffenetti v. Mellor, 323 Ill. 143, 153 N.E. 744; Williston, supra, Sec. 1820. Although the instrument is sealed, we do not doubt the applicability of the rule. Under the Illinois cases, a seal imports consideration and in

an action at law parties to a sealed instrument are estopped to deny the existence thereof. Hemmick v. Baltimore & O. S. W. R. Co., 263 Ill. 241, 104 N.E. 1027. But in equity proceedings such as the one before us, a seal creates merely a presumption of consideration and proof to the contrary is admissible. Mosby v. Chapin, 217 Ill.App. 442. We disagree, however, with the contention that this release was void for want of consideration.

■ Although the trial court made a finding supported by the evidence that at the time he executed the release, the plaintiff received no money or other property for his interest in General, this finding is sustained by the evidence only in so far as nothing was expressly given for the interest claimed. The plaintiff testified that a couple of days prior to the execution of the release, he had again reminded Muter of his claim and asked him to work out "something for my interest, percentage or something"; that Muter had promised to "get through an arrangement with * * * War Salary Stabilization Board—for one-half of one percent of the net sales of the Muter Company"; that on June 29, 1943, Muter brought the letter into the plaintiff's office and said: "This is relative to that temporary arrangement we talked about the other day," adding that the new arrangement was to be made retroactive to February. It was shortly thereafter that the plaintiff went into Muter's office, signed the release, and received two checks dated June 30, one for $5,117.75 and the other for $513.27, or a total of $5,631.02, representing his compensation for the five months ending June 30 on the new basis. Despite the plaintiff's assertion and the finding below that this transaction amounted to nothing more than a fixing of a higher value for the plaintiff's services, we cannot say as a matter of law that this transaction must be disassociated from the subject matter of the release. A more reasonable interpretation, it seems to us, is that Muter entered into this new arrangement in order to placate the plaintiff and put an end to his recurring demands. Reference in Muter's oral remarks, testified to by the plaintiff, as well as in the release, to previous conversations confirms our conviction that

the increase in compensation ties in with and supplies valid consideration for the release.

The plaintiff contends, however, that in any event the release was a nullity since Muter, who was then acting as fiduciary for the plaintiff, failed in his fiduciary obligation to make a full and fair disclosure to the plaintiff of his additional interest in the Muter Company or, what is tantamount thereto, of the proceeds and avails of his interest in General.

It is probably true that if Muter was a fiduciary, he would be subject to a duty to render an accounting and otherwise demonstrate that his conduct was not only honest but in conformity with "the punctilio of an honor the most sensitive." Jones v. Lloyd, 117 Ill. 597, 607, 7 N.E. 119; Norris v. Beyer, 124 N.J.Eq. 284, 1 A.2d 460; 4 Bogert, Trusts and Trustees, Part II, § 943, page 153; see Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 62 A.L.R. 1. It is also true that equity may employ the fiduciary concept to formulate and enforce ethical business standards in an infinite variety of situations. Tate v. Wieraman, L.R. 2 C.L. 55, 60; Buffman v. Peter Barceloux Co., 289 U.S. 227, 237, 53 S.Ct. 539, 77 L.Ed. 1140. But we find it impossible to ascertain when and how a fiduciary relationship arose in the present case. The trial court concluded that a fiduciary relationship was created prior to the contract and at the very beginning of the dealings between the parties. This conclusion, it appears, was based on the plaintiff's uncorroborated testimony that in April 1938 he had told Muter that he was inexperienced in corporate affairs and would leave his financial interests to the guidance of Muter and agreed to be represented by Muter's lawyer. Under the circumstances here presented, we think this evidence is insufficient.

In Vargas v. Esquire, 7 Cir., 166 F.2d 651, 653, we said:

"But where a fiduciary relationship does not exist as a matter of law, the burden of proving facts from which such a relationship arises is upon the person seeking to establish the relationship, and the proof must be clear, convincing, and so strong as to lead to but one possible conclusion.

Stewart v. Sunagel, 394 Ill. 209, 68 N.E.2d 268; Finney v. White, 389 Ill. 374, 59 N.E. 2d 859; Johnson v. Lane, 369 Ill. 135, 15 N.E.2d 710; Seely v. Rowe, 370 Ill. 336, 18 N.E.2d 874; and Commercial Merchants National Bank & Trust Co. v. Kloth, 360 Ill. 294, 196 N.E. 214.

\* \* \* \* \* \*

"But belief in the honesty and integrity of a close and intimate friend, Bordner v. Kelso, 293 Ill. 175, 127 N.E. 337; Higgins v. Chicago Title & Trust Co., 312 Ill. 11, 143 N.E. 482, or the existence of an employee-employer relationship, Doheny v. Lacy, 168 N.Y. 213, 61 N.E. 255; Renshaw v. Tracy Loan & Trust Co., 87 Utah 364, 49 P.2d 403, 100 A.L.R. 872, or debtor-creditor relationship, Guffey v. Washburn, 382 Ill. 376, 46 N.E.2d 971, or trust alone, is not sufficient to establish the relationship, Hancock v. Anderson, 160 Va. 225, 168 S.E. 458. Upon this state of the record it cannot be said as a matter of law that Vargas has established the existence of a fiduciary relationship by the proof required by the law applicable to such cases."

In that case, although the plaintiff was foreign-born, an artist, without business experience, and had trusted the defendant in all matters financial; and although the defendant had assumed the position of a close personal friend, devoted considerable attention to the plaintiff's career as an artist and had even advanced material amounts of money to the plaintiff, we held that the plaintiff had not met the standard of proof required to establish a fiduciary relation.

What is the substance of the evidence here? Stripped of extraneous matters, the record shows that the plaintiff, American-born, with three years of college education, who had operated his own manufacturing enterprise for fifteen years, entered into a deal with Muter which in retrospect proved extremely advantageous to the latter and not entirely unprofitable to himself. By uncorroborated and, in fact, vigorously contradicted, testimony, he now seeks to establish that from the inception and throughout their relationship his position was one of passive reliance and that in blind faith he had completely abdicated to Muter's influence and domination. The plaintiff's testi-

mony does not warrant a determination so sweeping. It may with equal, if not greater, rationality be explained as the offer of a man on the verge of bankruptcy with some $40,000 of personal liabilities hanging over his head and only $25,000 of assets to meet them, to one who was willing to take a chance on the future of his business to enter into any deal suitable to the latter whom he then regarded as his benefactor. In any event, it is not evidence "clear, convincing, and so strong as to lead to but one possible conclusion." Vargas v. Esquire, supra.

The judgment of the District Court is reversed.

KERNER, Circuit Judge (dissenting).

I agree that a fiduciary relationship did not exist here. Nevertheless, this is not enough to reverse the judgment, because in itself it is not determinative of this court's reversal. It is well settled that an appellate court cannot reverse a judgment if the judgment is right on the merits. Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224.

The controversial issue is the effect of the alleged release. The record in this case is voluminous and the evidence is conflicting. The court had the benefit of seeing and hearing the witnesses.

The court found that at the time that Muter told Lawrence that he was going to consolidate the activities of the Muter Company and General, he said to him, "to begin with he would issue to him 2,000 shares of The Muter Company stock and * * * would take care of plaintiff's interests in General Manufacturing Company later" and that "Lawrence told Muter that he would put his financial interests in General * * * in the hands of Muter." The court further found that "there was no agreement or understanding between Lawrence and Muter then or at any time that the contract of May 27, 1938 was then fulfilled and completed by the delivery to Lawrence of 2,000 shares of Muter Company stock"; that from 1939 until May, 1944, Muter promised Lawrence on many occasions that he would fully account to him for his interest in General, and that Lawrence during this period was, in fact,

misled and lulled by such promises into reliance upon Muter to fully account to him for his interest in General.

The court also found that on December 13, 1939, the date of consolidation of the corporations, the actual book value of each share of Muter Company was $1.1022 per share and that the book value of each share of General was $8.0757, and that the 2,000 shares of Muter Company stock received by Lawrence as partial consideration for his 2,000 shares of stock of General was grossly inadequate.

Concerning the letter of June 29, 1943, the court found as a fact that the letter was prepared by Muter and that the transaction by which Muter obtained the letter from Lawrence was fraudulent in that Lawrence signed the letter in reliance upon Muter's promise to fairly account to Lawrence after the war.

The contract of May 27, 1938, which was incorporated into the findings provided that Lawrence accept payment for his stock in General by "exchanging same for such stock or securities in said consolidated company * * * at the actual book value of such shares of stock of said General Manufacturing Company * * *."

From these findings the court concluded that in the event of consolidation of the corporations and the election of the parties to exchange Lawrence's stock in General for stock in the Muter Company a reasonable interpretation of the contract is that Lawrence receive stock of the Muter Company based upon the relative actual book value of the stock of General to the actual book value of the stock of the Muter Company at the time of such consolidation; that both parties did so elect and agree; that plaintiff performed all conditions, promises and covenants required to be performed by him under the contract; that Muter failed to perform his promises and breached his duty to plaintiff to the extent of 12,654 shares of Muter Company stock, which under the contract Muter was required to issue to Lawrence and which he now holds in breach of his trust and in fraud of Lawrence.

I doubt that it would serve any useful purpose to detail the evidence relating to

this issue. I believe it will be enough to say that I have examined the evidence and the testimony of all the witnesses heard, considered the inferences fairly to be drawn from all the evidence, and have reached the conclusion that Judge Igoe's findings are supported by the evidence. That was enough. Hence the findings are not clearly erroneous. In this situation, they are inescapably binding on this court. They must stand undisturbed on appeal. Rule 52(a) Federal Rules of Civil Procedure, 28 U.S. C.A.

The judgment should be affirmed.