NOAH C. ROGERS, appellant,

*v.*

HELEN FOUNTAIN GENUNG et al., respondents.

[Submitted June 25th, 1909. Decided November 15th, 1909.]

Where one engages to conduct, and enters into, negotiations for the purchase of lands for another, and is informed by his principal that he desires to purchase two adjoining tracts in order to make one property of them, a confidential relation arises, and the agent cannot, in equity, purchase on his own account one of the tracts and hold it against the interest of his principal, for one who undertakes to act for another may not, in the same matter, act for himself, and this rule extends to all cases in which confidence has been reposed, and applies as strongly to those who have gratuitously undertaken the trust, as to those who are to be paid for it. It is sufficient that the party undertaking the negotiations accepted and held a situation of trust in reference to procuring the land, and every man has a trust to whom a business is committed by another where his business is to advise or operate, not for himself, but for others.

---

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevens, whose opinion is reported in *71 Atl. Rep. 230*.

*Mr. Alfred Elmer Mills* and *Messrs. Collins & Corbin,* for the appellant.

*Mr. Charles A. Rathbun* and *Mr. Richard V. Lindabury,* for the respondents.

The opinion of the court was delivered by

BERGEN, J.

The bill charges that Harvey J. Genung, while acting as a confidential agent or broker for the complainant in negotiating the purchase of two tracts of land known respectively as the "Murphy" and "Conkling" properties, betrayed his trust by buying for himself, in the name of his wife, the Conkling tract. When the bill was filed a contract had been entered into by the vendors and the wife, by the terms of which a conveyance of the Conkling tract was to be subsequently executed and delivered, and the prayer of the bill is that the wife be decreed to assign the contract to complainant. The vice-chancellor dismissed the bill, and from that decree this appeal is taken. The confidential relation which is alleged to have existed between Genung, the husband, and the complainant, rests upon the following facts, viz.: The complainant, desiring to purchase the two tracts, wrote a letter to Genung, who was a real estate broker, for a list of "small places that you have for sale, with prices, near Madison, Convent, or Morristown Station." This letter was dated May 14th, 1907, and three days later Genung wrote to complainant, mentioning several properties, among them the Murphy and Conkling tracts, stating as to the former, "price $15,000," and as to the latter, "offered at $8,000." To this the complainant replied that these tracts would be of the most interest to him, and that he would be glad if Genung would ascertain the lowest prices, and what amount could remain on mortgage, and rate of interest.

The next step in the proceedings was an interview between Genung and complainant, during which complainant told Genung that he wanted both plots, and therefore the negotiations should run together, and Genung advised him to offer $13,000 for the Murphy tract, and $7,000 for the other, as $6,500 had been refused. The sale of the Murphy tract to complainant was accomplished, and that part of the negotiations has no relation to the present controversy, beyond the fact that Genung knew that the purpose of the complainant was to purchase both tracts, as a

part of a scheme to make them one property, an intention which complainant had disclosed to him at the opening of the negotiations for the purchases. The instructions, as testified to by complainant, were:

"Conduct the negotiations as one, because if I buy one I want to buy both, I want to buy them for a plot, and I want them pushed along simultaneously. * * * I don't want the information that I bought one to get to the owner of the other plots, because they might recede from their asking price."

The defendant Genung testifies on this point that complainant said he would take up "the negotiations of the properties independently and get whichever one he could, or both." We are not disposed to accept this as a denial of complainant's testimony, for the conduct of both parties indicates that at the outset it was understood that complainant wished to purchase both tracts, and are of opinion that the independent negotiations which Genung speaks of only referred to separate dealings with different owners.

With respect to the Conkling tract it appears that on June 4th, Genung reported that the Conkling property could probably be bought for $7,000 if Mr. Conkling was allowed to remain in the house and on part of the property for his life, but complainant, thinking it more desirable to have possession, authorized Genung to find out whether possession could not be had for a greater price, which he agreed to do. Complainant also requested Genung to go to Mr. H. C. Pitney, Jr., his attorney, after the negotiations had reached a point when the sale was likely to be accomplished, and have the contract drawn so that it could be promptly executed when an agreement was reached.

Mr. Pitney testifies that during the forenoon of June 5th, 1907, Genung came to his office and told him that the complainant was *negotiating through him* for the purchase of a piece of property, and had directed him to come to Mr. Pitney and have him prepare a form of agreement which he, Genung, could take with his report to the complainant on the evening of that day. Genung was unable to give the names of all the owners or a precise description of the land, and it was arranged that Mr. Pitney should get the description of the land from the records of

Morris county, and that Genung should get the correct names of the owners. Genung called at Mr. Pitney's office a few minutes before six o'clock on the afternoon of June 5th, and asked for the agreement, but Mr. Pitney told him it was not ready, and that he could either wait for it or have it sent to him later, but Genung said that he could not wait because he must meet the complainant a very few minutes after six at the Morristown Inn, and that he could get along without it that evening. As Genung did not come for the agreement during the next day, Mr. Pitney telephoned him on the 7th, in response to which he came to the office, and Mr. Pitney showed him the draft of the agreement, and thereupon Genung said that the agreement would not be used; that the complainant was out of the negotiation, and that he, Genung, would like to take the papers. To this Mr. Pitney demurred, but upon the assurance that Mr. Rogers was out of it, he finally gave him the agreement, and all of the papers except a short memorandum which Genung had brought to him on the 5th day of June. This memorandum was partly in the handwriting of Genung, and partly in that of Mr. Pitney, that written by Mr. Pitney being instructions from Genung. The following is a copy of the material part of the memorandum:

"Present absolute title and possession of the whole, $8,000. Reservation of possession of the lower part during life of W. H. Conkling, $1,000. This in option of purchaser. Consideration $8,000. Title one month after agreement. 10 per cent. or $800 on ex-agreement, balance on taking deed."

It thus appears that on the 5th of June, Genung, acting for the complainant, had gone to his counsel and told him that the complainant was negotiating through him for the Conkling property, and requested him to draw a contract according to the memorandum, part of which he had prepared, and part of which was prepared in his presence and under his direction by counsel, and that counsel did prepare the contract as instructed by Genung. On the same night the complainant, on his way from the train to his home, called upon Genung, who then stated that the Conklings "probably" would not sell at all except subject to a life interest. The interview was somewhat hurried, as the

complainant had a dinner engagement, but he told Genung that he wanted him to increase the price to $7,250, or $7,500, and, if necessary, to $8,000, if Conkling would give up his possession, and Genung agreed to do this, and said that he would report the next evening. On the evening of the next day, June 6th, complainant again stopped at the inn to see Genung and learn whether the Conklings would accept the higher price for the land with immediate possession, and Genung said:

"One thing is sure, they have decided that they won't sell except subject to a life lease, they won't take a higher figure, and they will sell only subject to a life lease."

To this the complainant replied:

"Very likely I will take it; anyhow I will telephone you, but very likely I will take it, but I would very much rather give a higher price and eliminate the life lease."

To this Genung replied: "I don't think that is possible," and complainant replied, "then I will let you know to-morrow whether I will take it with the life lease or not; I will communicate with you from New York."

When this last conversation took place Genung knew that his wife had made a contract with the Conklings to take the property for $7,000, subject to the life estate, which had been secured under the following circumstances: Genung, although he had directed Mr. Pitney to draw a contract in the interest of the complainant, and had agreed to submit complainant's offer of $8,000 for immediate possession, and to report the result to him that evening, took his wife with him to the Conkling place with a blank contract ready to be filled up, and a blank check to be signed by his wife, and after reaching the Conkling farm Genung asked the owners, according to the testimony of Mr. Fairchild, "If they would consider $8,000 and get out of the place in six months, or something like that, or at a stated time to be agreed upon," which the Conklings declined, and then Genung said: "Well, then, we will give you the $7,000 with the life right," and thereupon the contract under consideration was executed.

It appears that on the 4th or 5th of June, during an interview between them, Genung asked complainant whether he had a right to represent any other person than complainant, in the negotiation, and in reply was told, "Decidedly no, while you are representing me confidentially and submitting my offers I don't consider you have a right to represent anybody else or go into it with anybody else," and that if Genung did not want to conduct the negotiations for complainant he would get another broker. To this Genung made no reply, but as he continued to conduct the negotiations, it is presumed he did so upon the conditions thus stated.

We have no hesitation in finding from the evidence in this cause, that Mr. Genung engaged to act for the complainant in the negotiations for the purchase on complainant's behalf, of the Conkling property, from whom a duty arose on his part to act with entire good faith and loyalty for the furtherance and advancement of the interest of the complainant in the subject-matter of his agreement. That he understood that he was acting for the complainant in this particular matter is demonstrated, not only by his conduct towards the complainant, but by his statement to Mr. Pitney that the complainant was negotiating through him, that is, that he was acting for the complainant and in his behalf in the matter, and equity requires that where there exists, as in this case, a relation of trust and confidence between the parties, the agent be prohibited from acquiring rights antagonistic to his principal.

In this case Mr. Genung knew that the complainant was anxious to purchase the two tracts for the purpose of consolidating them into a single plot, and he undertook to negotiate for the complainant and agreed to ascertain the price, and report to him the conditions upon which the purchase could be consummated, and after he had obtained the confidence of the complainant and learned that he wished to buy both properties, and that he was so anxious to do it that he was willing to advance the price of one of them in order to secure immediate possession, he took advantage of that knowledge and contracted for the purchase in the name of his wife. The testimony shows that after

Genung had opened the negotiations he suspected that complainant was acting for an adjoining landowner named. Jenkins, and the fair inference is that he obtained control of the title for the purpose of making complainant pay a largely increased price, for when he told the complainant that the land was sold he said: "It is going to be held for a long time, and they want a very large price." It seems to us that it is a clear case of bad faith and disloyalty to the interest of one for whom he engaged to act, and it does not matter in such case that the agent is a mere volunteer, or acts gratuitously. *31 Cyc. 1432, 1433.*

The general rule is that he who undertakes to act for another in any matter of trust or confidence shall not in the same matter act for himself against the interest of one relying upon his integrity. *Gardner v. Ogden, 22 N. Y. 327,* and cases there cited. *Davoue v. Fanning, 2 Johns. Ch. 260.* "So if an agent employed to purchase for another, purchases for himself, he will be considered as the trustee of his employer." *Story Eq. Jur.* § *316.*

As was said by Vice-Chancellor Dodd, in *Wright v. Smith, 23 N. J. Eq. (8 C. E. Gr.) 106:* "The rule extends to all cases in which confidence has been reposed, and applies as strongly to those who have gratuitously or officiously undertaken the management of another's property, as to those who are engaged for that purpose and paid for it." In that case the complainant was anxious to purchase an interest in certain mineral lands, and the fee of other lands, and made known his wishes to Smith, the defendant, and told him what sums he would be willing, if necessary, to pay. Smith undertook as a friend to negotiate for their purchase, because it was thought he could buy to a better advantage than the complainant, who was to take title through Smith if he purchased. Smith purchased at a much less price than Wright had said he was willing to pay if necessary, but led Wright to believe that he had paid the highest sum he had intimated he was willing to give, and the bill was filed to bring Smith to an account. In holding the defendant to an accounting the vice-chancellor said, that the fact that Smith was not formally constituted an agent with authority to bind the com-

plainant, or that his agreement to act for him was not formally made, "are points, which, if true, are of no sort of importance, nor is it important that no agreement was made to compensate him for his services. It is sufficient that he accepted and held a situation of trust in reference to procuring the lands. Every man has a trust to whom a business is committed by another. Every man is a trustee whose office is to advise or to operate, not for himself, but for others." Therefore, if Genung had made the contract in his own name, his relations with the complainant were such that complainant had a right either to affirm or repudiate the contract, and if he manifests his desire to affirm, his agent cannot refuse to transfer it to him.

It is urged, however, that as Genung had the property for sale he was the agent of the vendor, and if he became the agent of the complainant in the purchase of the property, he was disloyal to his earlier employment.

We find nothing in the case upon which to base such an agency; there was none created by any writing which authorized Genung to sell, or to pay him commissions. The only promise he had was an oral one by Mr. Fairchild, which was, "if he could sell the place, why we would give him commissions." No price or terms were named; it amounted to nothing more than saying to a real estate broker, "if you produce a purchaser, and he and the owners can agree upon terms, and a sale is effected, we will pay you commissions." This imposed on Genung no duty to be observed towards the seller regarding the price; he was only a broker without any authority to offer terms; all that was expected from him was the production of a person ready to enter into negotiations with the owner, and the limit of his interest in the matter was to produce a purchaser with whom the seller might negotiate. The vendors in this case realized Genung's position, and with him suspected that Jenkins was the real purchaser and regulated their price accordingly. They accepted his offer, and made the contract with his wife, with full knowledge that he was acting for the purchaser, and in every respect treated him as a bidder for the land. Certainly they could not have understood that he was acting in their interest as against him-

self or his wife. The entire negotiations were conducted between them at arms length. The relation disclosed between the vendors and Genung is no answer to the fraud perpetrated by him in his dealings with the complainant, and he cannot be allowed to escape with the fruits of his wrong doing.

The defendants also urge that even if Genung was the agent of the complainant and was disloyal to his principal, nevertheless that does not affect the right of his wife to purchase even if she had knowledge of all the circumstances. We do not consider that we are required to pass upon this claim, because we are satisfied from the evidence that the purchase was, in truth and in fact, made by Genung, and that the wife was used by him as a cover to protect him against being required to account to his principal.

Equity looks at the substance, and not at the form of a doubtful transaction. What the husband knew was, that his principal was very anxious to purchase this property, and he had reason to believe that he would take the property at $7,000, subject to the retention of possession by Conkling, during life, of a part of the premises if he could do no better. He also knew that the complainant was willing to pay $1,000 more if the property could be had with immediate possession, and he had been engaged to make such offer. He had a very strong suspicion that Jenkins wished to buy the property, through the complainant, and if he could defeat the complainant and have the title vested in his wife, he would be in a position to exact a very large price. All of this, it is admitted, the wife knew, and it is fair to infer that she knew the purpose which her husband had in mind, because when they left home for the pretended purpose of making the offer for the complainant, they carried with them a contract ready to be filled up and executed, and also a check which the wife afterwards signed in payment of the percentage required, from which a presumption arises that he did not intend to submit the offer of the complainant fairly, and Mr. Fairchild, who seems to be a disinterested witness, testified that Mr. Genung was the spokesman, and his wife took no part in the negotiations; that Genung said, "We will give you $7,000," thus in-

dicating that he had some interest in the purchase. It is manifest from this testimony that Genung, when he left home, intended to buy the property, and also that the contract was made in the name of the wife, not as a *bona fide* purchaser, but under the direction of the husband for the very purpose of setting up the claim which he now urges in order to escape the fulfilling of his duty to the complainant, and while the marital relation would not perhaps prevent the wife from purchasing in her own right if she chose to do so, still that relation is an element to be considered in determining which of the two is the real purchaser. All transactions in which a wife claims to hold property in her own right, where it is the interest of her husband that she should do so to protect him against the claim of another, are always scrutinized with the utmost care when questioned, because of the relation of confidence and trust which is presumed to exist between them, and we are of opinion that the evidence in this case warrants the conclusion that the wife took the title for her husband, for the reason that if the contract was made with him the fraud would be so manifest that he could not support it, and that she acted for him, in order to aid him in carrying out his fraudulent intention. This property had been in the market for some time; the wife knew of it and had offered $6,000 for it, and that being refused had abandoned the purchase, and the testimony does not show any further interest in the matter on her part until her husband had determined to defraud his principal, when she went with him, prepared to carry out his purpose. We find no reason to believe that the wife holds this contract as her own, but, on the contrary, that she joined her husband in the commission of a fraud upon the complainant and holds the contract for her husband subject to his direction and control.

The defendants also insist that if it be true that the transaction was carried out for the express purpose of defrauding the complainant, still he is without remedy, because the trust, not being declared in writing, is subject to the statute of frauds. But the statute does not apply where the "trust or confidence shall or may arise or result by implication or construction of

law." No trust was created in this case by any agreement of the parties; it arose by implication or construction of law out of the confidential relations of the parties. Genung was not authorized to buy and hold in trust; his duty was to aid his principal in purchasing, and having been engaged to do this, he cannot, by any fraudulent act, during the period of his engagement, thwart his principal by making it impossible for him to accomplish his purpose, and if in carrying out such disloyal intent, he makes a contract of purchase in his own name, it is the contract of his principal.

The case shows that on the day the answer was filed an order was made by the chancellor permitting the defendants to execute the contract according to the terms, but restraining the defendants Genung from making any disposition of the land until the further order of the court. She and her husband will therefore be decreed to convey to the complainant, upon payment, to them, of the money paid as a consideration for the conveyance according to the terms of the contract.

The decree appealed from is reversed, with costs.

*For affirmance*—THE CHIEF-JUSTICE, REED, BOGERT—3.

*For reversal*—GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, VREDENBURGH, GRAY, DILL, CONGDON—11.