A decree for an accounting was awarded complainant in the court of chancery. The defendant appeals.
The complainant, Bessie H. Norris, a widowed lady past seventy-five years of age, alleged in her bill of complaint that the defendant, a broker in stocks and bonds, upon learning that complainant owned certain bonds, sought her out, representing himself to be an "investment counsel" and an expert in securities, and advised her that because of his special knowledge and ability he could increase her capital account without depleting her then income by buying, selling and exchanging securities for her; that relying upon these representations a relationship of trust and confidence arose between the parties; that defendant took over her account and by his operation thereof she suffered serious money losses while he secretly profited; that she elects to avoid the several transactions and prayed that defendant be decreed to account to her and make good the losses sustained.
The answer denied the asserted relationship of trust and confidence and averred that defendant at all times exercised his best judgment to protect Mrs. Norris' capital investment and to increase her income; that the purchases and sales of the securities made for complainant were authorized by her; and, further, denied that the defendant made secret or undisclosed profits at the expense of complainant.
The testimony shows that when, on July 10th, 1931, the defendant first presented himself to Mrs. Norris she owned seven per cent. Collateral Bankers Bonds, the par value of which was $2,500 and the then market value $2,077, yielding an income of $172 a year; that the defendant advised the sale of these bonds and the reinvestment by him of the cash proceeds, which was done, the defendant saying, according to the complainant, that he would increase her capital account without loss of income; that as a result of the purchases and sales of securities made by defendant, complainant's principal and income were greatly depleted. In his operation of this *Page 286 
account it indisputably appears that the defendant, in most instances, bought securities that paid no dividends, which was contrary to his agreement to keep up complainant's income. It is also clear that the investments made were neither sound nor prudent for a person of complainant's slender means, and that defendant profited by a substantial commission on each purchase so made. In short, when the defendant's activity in Mrs. Norris' account was halted, she had a loss of approximately $1,300 while the defendant had profited to the extent of $432. The complainant charges that this sum was a secret and undisclosed profit. The defendant maintains that his gain represented an ordinary commission on the purchases made for complainant's account.
We think that the amount should be regarded as a secret profit for the reason that it was really a premium paid defendant by underwriting brokers out of the purchase price charged complainant, for "distributing" their untried securities. The amount was extraordinarily high for handling the "buying" side of this small account and greatly in excess of the rate fixed by the stock exchange regulations for the purchase and sale of listed securities. And, finally, while the complainant knew that the defendant was making some commission on her account defendant never told her the amount thereof or the rate.
The defendant's testimony is not persuasive. He admitted that he sought out the complainant when he learned from her sister, Mrs. Green, that she owned these seven per cent. Collateral Bankers Bonds; he advised her to change her investment because, as he says, he believed that these bonds were not a safe investment. The learned vice-chancellor who heard the case did not believe this testimony, nor do we think it credible. We think it is clear that the defendant wanted the complainant as a customer for the unseasoned securities he was distributing and, of course, she could not become a customer unless she had cash, and the only way to put the complainant in a cash position was to sell what she owned.
It is also clear that the defendant took advantage of the confidence which the complainant reposed in him. Whatever *Page 287 
he advised be done was done. Furthermore, his letters to complainant indicate that at times purchases were made for her account without advising her of the fact until after the investment was made. On one occasion certain shares bought for Mrs. Norris at $2.60 each, having receded in price to "$2.07 bid, $2.30 asked," defendant personally bought the four hundred and fifty shares, which she had, at the bid price and later disposed of them at the asking price of $2.30. He admitted that he could not buy same in the open market at the bid price. He did not tell Mrs. Norris that he was the purchaser. This transaction, in the light of the relationship between the parties, was unconscientious. The defendant concedes that he should be charged with the profit on this transaction.
Furthermore, the defendant had the duty of explicitly advising the complainant, who was manifestly inexperienced in stock market matters, of the precise kind of investment being made for her. It is fair to say that he was not open and candid in his dealing with her — that he did not advise her that for the most part he was investing her money in new and untried securities and that his commission on the kind of securities he was "distributing" would perhaps amount to ten per cent. and on a "very speculative variety, it may run up to twenty-five per cent. or thirty per cent."
In a word, as a substitute for the bonds owned by the complainant, whose history was admittedly good, with no default of interest and which at times paid "extras," the defendant invested the complainant's principal in National Industrial Shares or "Trust Shares," as he called them, a company which was organized in 1930, the original shares of which were still in the process of being "floated" at the time he made the initial purchase for the complainant's account. When asked what its record was as to dividends on July 10th, 1931, the date of purchase, the witness answered that the company hadn't had an opportunity to have a record yet. Other stocks were likewise obtained from "distributing houses." Another purchase made in October, 1932, was of shares of a company incorporated during the previous month. *Page 288 
This stock, of course, had no dividend record. Defendant also made investment for the complainant in the Robert Gair Company, in November, 1935. The company had been reorganized in 1932, and had paid no dividends.
The following testimony is informative on the issue before us and, in our judgment, crucial: "Q. Your reason for wanting Mrs. Norris to dispose of her bonds was so that you could make a market for some of the stock that you were selling, wasn't it? A. Not to make a market for them. Q. There was no market unless you made it, was there? A. I don't think I follow you.Q. Isn't it a fact that on these unlisted securities you have to make a market for their sale, especially on these new issues? A. Yes, you have to find buyers. Q. Sure, that was your business? A. Exactly. Q. Mrs. Norris was not a buyer just so long as she had no money, was she? A. That is right. Q. But if she could have turned her bonds into cash, then she would be a prospective buyer? A. That is right. Q. That was the reason you wanted her to sell the bonds? A. Yes, I felt that she was going to benefit herself by so doing or I would not have made the recommendation initially."
The learned vice-chancellor who heard this case concluded that a trust relationship had been established between the complainant and defendant; that the complainant, untrained in business — she had been a domestic servant for years — was susceptible to the defendant's influence, trusted him implicitly, and that he had abused that confidence. A decree was advised awarding the complainant an amount equal to the present value of the bonds originally owned by her and which the defendant sold at the time he began his speculative operation, plus the sum of $1,138, representing the income which those bonds yielded during the interval, allowing the defendant credit for whatever money complainant had from the defendant up to the time the bill was filed and directing the return of the securities held by the complainant to the defendant.
This decree works out simple justice and will be affirmed. We are persuaded from the facts of the case that a trust relationship existed between the parties. Even though an *Page 289 
express trust was not within their intention at the time their agreement was made, a court of equity will raise a trust by construction when, as here, the party charged has practiced a fraud upon his principal. Cf. 1 Perry Trusts and Trustees ch. 6p. 267 § 166.
Unconscientious conduct creates a constructive trust which, under circumstances like the case before us, arises ex delicto.
The appellant argues that he was not a trustee but a broker only. This argument finds little to support it in the testimony. He assumed the role of financial guide and the law imposed upon him the duty to deal fairly with the complainant even to the point of subordinating his own interest to hers. This he did not do. He risked the money she entrusted to him in making a market for hazardous securities. He failed to inform her of material facts affecting her interest regarding the securities purchased. He consciously violated his agreement to maintain her income, and all the while profited personally at the complainant's expense. Even as agent he could not gain advantage for himself to the detriment of his principal. Dodd v. Wakeman, 26 N.J. Eq. 484;affirmed, 27 N.J. Eq. 564; Porter v. Woodruff, 36 N.J. Eq. 174;Gillmore v. Tuttle, 32 N.J. Eq. 611; Dunn v. Dunn, 42 N.J. Eq. 431,448; 9 C.J. 536 § 38; 2 C.J. 889 § 581; Harrop v. Cole,85 N.J. Eq. 32. Compare McAllister v. McAllister, 120 N.J. Eq. 407;affirmed, 121 N.J. Eq. 264.
The decree is affirmed.
For affirmance — THE CHIEF-JUSTICE, TRENCHARD, PARKER, DONGES, HEHER, PERSKIE, PORTER, HETFIELD, DEAR, WOLFSKEIL, RAFFERTY, WALKER, JJ. 12.
For reversal — CASE, WELLS, JJ. 2. *Page 290