The bill alleges that on or about September 12th, 1944, complainant employed Harry C. Marsella, one of the defendants, a real estate broker, to purchase certain lands and *Page 522 
premises therein described, from the Weehawken Trust Company; that pursuant to the engagement Marsella contacted the trust company and negotiated for the purchase of the premises, but contrary to his agreement with complainant, caused a transfer of the premises to be made to one Anna Mack, a defendant herein, his alleged "dummy," for the sum of $8,500. The bill asks for a decree declaring the defendants hold the premises in trust for the complainant.
Marsella and Anna Mack deny complainant's charges of collusion. Marsella says he was not retained by the complainant. Anna Mack admits that she holds title to the premises, but alleges that she purchased the same in her own name and with her own funds, and that Marsella has no interest whatever in the premises.
The testimony is to the effect that Marsella visited the complainant and asked him if he were interested in acquiring the property. Complainant replied that he was, but not for the Trust Company's asking price of $12,500 (Exhibit C-1). Marsella then stated that the property could be bought for a sum running between $8,000 and $8,500; thereupon complainant said that he would be willing to purchase the property for a price within or about those figures, and he directed Marsella to immediately proceed with arrangements to purchase. Marsella made no report of his efforts to purchase until complainant sought and found him. He then told complainant the property could not be purchased for the sum specified. Complainant then went to the office of the Trust Company and saw Robert Mengels, an official of the Trust Company, in charge of the premises, who, upon inquiry, informed him that Marsella had produced a purchaser for the property in question and that it was to be sold to that person. The complainant then contacted Marsella who informed him that the property was to be sold to the defendant Anna Mack.
The testimony of the complainant, and his wife, and son-in-law, is to the effect that Marsella was hired by the complainant as his agent to purchase the property; that the complainant's wife and son-in-law were in his office and heard the conversation about the proposed terms of purchase that *Page 523 
had taken place between complainant and Marsella, and they corroborated complainant's testimony. Complainant's daughter, Beatrice Tell, testified that several weeks after her father directed Marsella to purchase the property for him, she told Marsella that he had "double crossed" her father in breaching the agreement to represent him and criticised his conduct in instituting dispossess proceedings to oust the family from the premises in question. Marsella replied saying, in effect, that he could do as he pleased with his money and that he intended to repair and modernize the building and occupy the store for his own office.
On September 16th, 1944, the Great Central Realty Co. submitted a communication to the Trust Company saying it obtained an offer to purchase the premises for $8,100 (Exhibit C-7). The offer appears on the stationery of the Great Central Realty Co., signed "Great Central Realty Co. by Harry C. Marsella," and a check of the Great Central Realty Co. for $100 signed by "Harry C. Marsella, President," accompanied the offer (Exhibit C-8). The letter and check are dated four days after the day the complainant alleges he retained Marsella to purchase the property for him.
On September 20th, 1944, a contract for the sale of the premises for $8,500, between the Trust Company and Anna Mack was executed (Exhibit C-2). At the time of the execution of the contract of sale, a check of the U.C. Holding Co., dated September 21st, 1944, in the amount of $400, with the aforesaid check for $100 from the Great Central Realty Co. was given, and received, as a deposit on account of the purchase price.
On October 23d 1944, the title to the premises was conveyed to Anna Mack. When the title passed there was delivered to the Trust Company a check for $1,100 made by the U.C. Holding Co. (ExhibitC-5), a check from the Great Central Realty Co. for $795.55, and a bond and mortgage for $6,300.
On October 25th, 1944, the Great Central Realty Co., agent for Anna Mack by Harry Marsella, served upon the complainant a notice to vacate the premises in question (Exhibit C-13). *Page 524 
The evidence discloses that a friendly and business relationship existed between Marsella and Anna Mack for a period of approximately fifteen years. Marsella testified that he had "roomed" with her for fifteen years, and that he also took meals at her home on many occasions. He admitted that he and Anna Mack had been involved in many business transactions together, and admitted that the store or office he occupies is in the building, 415 Thirty-eighth Street, Union City, owned by her.
On November 1st, 1944, the complainant paid rent for that month by check drawn to the order of Marsella (Exhibit C-14). On the same day Frank Aragona paid the rent for the premises occupied by him by check drawn to the order of Anna Mack, c/o G.C. Realty Co. (Exhibit C-15). Marsella endorsed the check (Exhibit C-14) drawn to his order, and he also endorsed thereon, "U.C. Holding Co.," and deposited the same to the U.C. Holding Co. account. He also endorsed the check (Exhibit C-15) with the name of Anna Mack, c/o G.C. Realty Co., and U.C. Holding Co., and deposited it to the U.C. Holding Co. account.
Exhibits D-6 and D-7 are two checks representing a total of $895.55 paid to the Great Central Realty Co. on account of the purchase price, were offered in evidence to show that the sums were repaid. The repayments, however, were not made until October 31st, and December 7th, 1944. The October 31st, 1944, check is for $300, and the December 7th, 1944, check is for $595.55. The defendants gave no explanation as to where those funds came from other than that they were checks of the U.C. Holding Co.
Anna Mack testified that she has a controlling interest in the U.C. Holding Co. and that Marsella had no interest in the corporation. It will be observed Marsella endorsed checks payable to U.C. Holding Co. and deposited them in the account of U.C. Holding Company.
It is my opinion that Marsella had been employed as agent to purchase the premises for the complainant, and that he violated the confidence the complainant reposed in him and betrayed that confidence by causing the premises to be conveyed to Anna Mack. She, I am convinced, acted as a dummy for Marsella. *Page 525 
I was not impressed with the candor of either Marsella or Anna Mack. I believe they set out to acquire the premises after learning of complainant's desire to purchase it, in the hope that they could resell it to him at a profit. There is evidence that Marsella asked a profit of $1,945 from complainant to convey the premises to him.
To deny the complainant the relief he seeks, would, in effect, be rewarding the duplicity of Marsella and his associate in the fraud, Anna Mack. A somewhat similar situation appears in the case of Porter v. Woodruff, 36 N.J. Eq. 174, where Vice-Chancellor Van Fleet, among other things, said:
"The general interests of justice and the safety of those who are compelled to repose confidence in others alike demand that the courts shall always inflexibly maintain that great and salutary rule which declares that an agent employed to sell cannot make himself the purchaser, nor, if employed to purchase, can he be himself the seller. The moment he ceases to be the representative of his employer and places himself in a position towards his principal where his interest may come in conflict with those of his principal, no matter how fair his conduct may be in the particular transaction, that moment he ceases to be that which his service requires and his duty to his principal demands.
 * * * * * * *
"In such cases the courts do not stop to inquire whether an agent has obtained an advantage or not, or whether his conduct has been fraudulent or not, when the fact is established that he has attempted to assume two distinct and opposite characters in the same transaction, in one of which he acted for himself and in the other pretended to act for another person, and to have secured for each the same measure of advantage that would have been obtained if each had been represented by a disinterested and loyal representative, they do not pause to speculate concerning the merits of the transaction, whether the agent has been able so far to curb his natural greed as to take no advantage, but they at once pronounce the transaction void because it is against public policy. The salutary object of the principle is not to compel restitution in case fraud has been committed or an unjust advantage *Page 526 
has been gained, but to elevate the agent to a position where he cannot be tempted to betray his principal. Under a less stringent rule, fraud might be committed or unfair advantage taken, and yet, owing to the imperfections of the best of human institutions, the injured party be unable either to discover it or prove it in such manner as to entitle him to redress. To guard against this uncertainty, all possible temptation is removed, and the prohibition against an agent acting in a dual character is made broad enough to cover all his transactions. The rights of the principal will not be changed, nor the capacity of the agent enlarged, by the fact that the agent is not invested with a discretion, but simply acts under an authority to purchase a particular article at a specified price, or to sell a particular article at the market price. No such distinction is recognized by the adjudications, nor can it be established without removing an important safeguard against fraud."
See Rogers v. Genung, 76 N.J. Eq. 306; 74 Atl. Rep. 473, in which the principle above enunciated is emphasized; the court there, among other things, said:
"We have no hesitation in finding from the evidence in this cause, that Mr. Genung engaged to act for the complainant in the negotiations for the purchase on complainant's behalf, of the Conkling property, from whom a duty arose on his part to act with entire good faith and loyalty for the furtherance and advancement of the interest of the complainant in the subject-matter of his agreement. That he understood that he was acting for the complainant in this particular matter is demonstrated, not only by his conduct towards the complainant, but by his statement to Mr. Pitney that the complainant was negotiating through him, that is, that he was acting for the complainant and in his behalf in the matter, and equity requires that where there exists, as in this case, a relation of trust and confidence between the parties, the agent be prohibited from acquiring rights antagonistic to his principal."
The court further said in this case:
"The general rule is that he who undertakes to act for another in any matter of trust or confidence shall not in the *Page 527 
same matter act for himself against the interest of one relying upon his integrity."
In the circumstances, I shall advise an order granting the relief prayed for.