51 N.J. Super. 393 (1958)
143 A.2d 892
THOMAS TIERNAN AND CATHERINE TIERNAN, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS,
v.
CARASALJO PINES, A CORPORATION, AND RAEF M. HADDAD, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 17, 1958.
Decided July 31, 1958.
*395 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Albert L. Kushinsky argued the cause for plaintiffs-appellants and cross-respondents (Messrs. Kushinsky & Muccifori, attorneys; Messrs. Lum, Fairlie & Foster, Vincent P. Biunno, of counsel).
Mr. Merritt Lane, Jr., argued the cause for defendants-respondents and cross-appellants (Mr. Edward F. Juska, attorney; Messrs. McCarter, English & Studer, of counsel).
The opinion of the court was delivered by FREUND, J.A.D.
The principal issue to be determined is whether $12,000 paid to defendant Raef M. Haddad by the plaintiffs was a loan of money, or was a purchase of a 25% interest in Carasaljo Pines, a corporation (hereafter called Carasaljo). The transaction is evidenced by a letter agreement dated April 12, 1949.
*396 The complaint contains two counts. The first count alleges that on April 12, 1949 plaintiffs and defendant Haddad entered into a written agreement whereby Haddad "sold to the Tiernans a 25% interest in Carasalja Pines," the owner of a tract of land in Lakewood Township, N.J. The land was sub-divided into lots and was being sold as so sub-divided. Haddad agreed to account for and to pay over to the plaintiffs 25% of the net profits. Haddad was the owner of 50% of the stock of Carasaljo. It is further alleged that Haddad received plaintiffs' share of the net profits and refused to pay over to them their share, for which they seek an accounting. The second count alleges that after plaintiffs negotiated with Katherine T. DeBow, an employee of Lakewood Hotel and Land Association (hereafter called Land Company), defendant Haddad agreed to sell them 100 acres of land owned by the Land Company, for $12,500. When they met with Haddad to consummate the sale he told them he owned 50% of the stock of Carasaljo and recommended that, instead of buying the Land Company property, they "purchase 50% of his holdings in the defendant company for $12,000," and guaranteed in writing the repayment of the moneys so invested. Plaintiffs say they relied upon Haddad and turned over to him the $12,000 and signed the agreement by which they claim they became the owners of a 25% interest in Carasaljo. They further allege that in 1949, 1950 and 1951 Haddad sold about $150,000 worth of land belonging to Carasaljo and that plaintiffs on many occasions had inquired as to whether or not there were any profits due them, but Haddad told them that there was no profit nor did he anticipate any in the near future. Plaintiffs believed Haddad, and in 1951 accepted the return of their investment of $12,000 with interest for two years at 2%. In 1956 plaintiffs were informed by Katherine T. DeBow that the Carasaljo venture had been profitable, whereupon they demanded an accounting by Haddad, which he refused. Plaintiffs demand that Haddad account for moneys received by him from Carasaljo and a judgment for any moneys found due to the plaintiffs.
*397 The answer of Haddad by separate defense states that on August 25, 1950 plaintiffs executed a receipt in full for all moneys due them, and the answers of both defendants rely upon separate defenses of the statute of limitations and laches. The pretrial order states the issues to be: "fraud in the inducement, deceit, unilateral mistake, specific performance, rescission, breach of a fiduciary relationship, agreement, fraud, laches, statute of limitations, statute of frauds, performance of all agreements, if any," and "no issue abandoned."
At the conclusion of the hearing the trial judge orally made findings of facts that the plaintiffs had the utmost confidence in Haddad, they depended upon his advice, he knew they were disturbed by the lack of profits from their investment and by the fact that the moneys given to Haddad were owed to relatives; that Haddad had a duty of full disclosure to them and that there was no intentional breach of the fiduciary relationship; Haddad did not in any way intend to deceive or mislead the plaintiffs. The trial judge ruled that the transaction was a sale to plaintiffs and not a loan and that they were entitled to one-half of Haddad's profit as a result of their ownership of one-half of Haddad's 50% interest in Carasaljo. He also said that plaintiffs were entitled to receive from Haddad "one quarter interest in Carasaljo Pines, namely, the one half of Mr. Haddad's stock in this corporation upon the payment to him of $12,000." He further held that Haddad breached his duty when the moneys were returned to plaintiffs without disclosure to them of the financial condition of Carasaljo, which had due a substantial amount of accounts receivable because of the number of sales in 1949, which moneys, if received, would substantially increase the profits of Carasaljo. He further found, however, that the Tiernans would have "gladly taken back their $12,000" when they did, even if the "entire situation had been explained to them by Mr. Haddad."
Subsequently a motion was made to settle the form of the judgment, and the trial judge refused to award a money judgment to the plaintiffs because there was no complete *398 accounting testimony. The judgment provided that within 45 days from the entry of the judgment, upon payment of $12,500 by the plaintiffs to Haddad, he should turn over to the plaintiffs one-half of his stock in Carasaljo. The judgment further provided that plaintiffs, when they became stockholders, could continue the present litigation and would then be entitled to an accounting from the defendants. The trial judge stated that while a risk was cast upon the plaintiffs if they advanced $12,000 to repurchase the stock, they could not properly be allowed to obtain from the defendant the accounting information until they were stockholders of Carasaljo. The trial judge refused to accept plaintiffs' argument that the payment of the money by plaintiffs to Haddad would also revive Haddad's guarantee contained in the agreement of April 12, 1949.
Plaintiffs appeal from those parts of the judgment which: requires them to repay $12,500 to Haddad to secure a return of their stock in Carasaljo, without at the same time restoring to plaintiffs the benefits of the guarantee contained in the letter agreement of April 12, 1949; requires the repayment to be made as a condition for an accounting for profits, without an opportunity to become apprised of the facts necessary to determine plaintiff's course of action; fails to determine that Haddad or Carasaljo is required to account for plaintiffs' share of the profits in Carasaljo, without first requiring repayment; fails to determine that Haddad had breached the trust and confidence of the plaintiffs; and fails to enter a money judgment against Haddad and Carasaljo based upon the moneys received by Haddad by way of profits. The defendants cross-appeal from the entire judgment.
The facts are complex, although the essential basic picture comes through on close inspection of the record. We conceive that the fundamental question is whether by the letter agreement of April 12, 1949 the plaintiffs gave Haddad the $12,000 as a loan or as a payment for a half-interest of the 50% interest that Haddad owned in Carasaljo. Another question pertains to the circumstances under which the plaintiffs requested and received the return of their $12,000.
*399 Plaintiff Thomas Tiernan was a retired New York City policeman. His wife, Catherine, had been employed for some 30 years by the Western Union Telegraph Co. Both had known Haddad since 1944, having purchased from him three parcels of real estate. Since 1918 Haddad has been engaged in buying and selling real estate in Long Island and New Jersey.
In 1946 Haddad owned practically all the issued stock of the Land Company. The Company was in need of money to pay taxes and Haddad was able to persuade Joseph Kesler to lend it $25,000. But the transaction for devious reasons took the following form: Kesler organized the Carasaljo Pines, a corporation, all the stock being issued to him and his family, and 180 acres of land was conveyed to the corporation by the Land Company for the sum of $25,000. Kesler advanced the $25,000 and took a note from Carasaljo Pines therefor. Haddad guaranteed the repayment of the $25,000 to Kesler, and members of the Kesler family assigned a 50% interest in Carasaljo to Haddad. Haddad testified that in his agreement with Kesler it was stipulated he was not to withdraw any moneys for compensation from Carasaljo, nor were any profits to be distributed, until the $25,000 was repaid. He also testified that before plaintiffs turned over their $12,000 to him (Haddad), he showed them the guarantee to Kesler.
However, certain arrangements which were put into effect in connection with Carasaljo's actual land sale operations cast additional light on the true nature of the Haddad-Kesler deal. All promotional work and sales supervision was done by the Land Company (90% owned by Haddad) which was paid a commission originally of 10-12%, but after March 1949, of 25% of the selling price. The salesmen who did the actual selling received a 15% commission and a promotion man received an override commission of 5%. All advertising was done by an agency controlled by Kesler at fixed fees and Kesler himself drew $175 per month for "travelling expenses." Sales were on the installment plan, with a 30% down payment. In the beginning, therefore, *400 profits were bound to be meagre, as the various expenses of sales exceeded down payment cash receipts.
Haddad testified in a deposition that the Tiernans were at his office every other weekend and they developed a friendship with him. They planned to live in Lakewood and he had discussed with Mrs. Tiernan the possibility of her working in his office.
Katherine T. DeBow early in 1949 was manager and sales director of the Land Company. She knew the plaintiffs were interested in purchasing land in Lakewood. She showed them 100 acres of land known as Pine Acres and came to an understanding as to its purchase for $12,500. Haddad was told of the proposed sale and he discussed the transaction with the Tiernans on two different occasions at his Long Island office. He discouraged them from buying vacant land because it was a hazardous investment and he did not want them to lose any of their money. He said that the paramount issue was the safety of their principal. Haddad knew that part of the money plaintiffs were trying to invest was borrowed from Mr. Tiernan's sister. In the course of their conversations Haddad convinced them that it would be better to invest the money with him. As the result of their discussions the plaintiffs delivered $12,000 to Haddad on April 12, 1949. He dictated an agreement in the presence of the defendants, which they read and signed, and then gave Haddad the $12,000. The agreement reads as follows:
 "Raef M. Haddad
 60-10 Roosevelt Avenue
 Woodside, N.Y.
 Telephone Havemeyer 9-4300
 April 12th, 1949.
 Mr. Thomas J. Tiernan, and
 Mrs. Catherine E. Tiernan,
 196 East 38th Street,
 Brooklyn, New York.
Dear Mr. and Mrs. Tiernan:
This will acknowledge receipt from you of the sum of $12,000.00 as a loan for which you will receive in lieu of interest half of my profits on my investment in the Carasaljo Pines development property located on Myrtle Place, South side of Lake Drive and Central *401 Avenue, running through to Hope Road in the Township of Lakewood, Ocean County.
It is to be understood and agreed that you shall have the privilege of calling this entire loan at any time the occasion may arise, where part of this $12,000.00, or all of it, should be needed by you, under one condition, that you will give me, Raef M. Haddad, a notice of not less than sixty (60) days.
Should the money be demanded before a years time, then 2% will be paid instead of the participation in the profits.
In the event of my becoming incapacitated, ill or deceased, I direct my estate to pay the $12,000.00 loan, together with a bonus of $2,500.00, or leave it to the option of the Tiernans to continue on the above items agreed upon.
 Very truly yours,
 /s/ Raef M. Haddad
 Raef M. Haddad
 ACCEPTED:
 /s/ Thomas J. Tiernan
 /s/ Catherine E. Tiernan"
There is ground for suspicion that the transaction took the foregoing form because of tax problems involved in the sale of stock, the tax basis for which was zero, discounting the guarantee given to Kesler. This is substantially the holding of the trial judge insofar as the tax implications are concerned.
Haddad conceded that the plaintiffs were willing to invest the $12,000 in whatever he recommended, and said their protection was uppermost in his mind. He realized the plaintiffs were hardworking people and, in view of their relationship, Haddad testified, there was no use in discussing business propositions with them because "it would go over their heads" and so he told them "nothing." He said they left their money for him to protect. They would have done anything he suggested. He said that he told plaintiffs of Carasaljo's indebtedness to Kesler, and that he and the Tiernans had faith in each other.
Mrs. Tiernan testified that in 1949, after the advance of the $12,000, she and her husband were persuaded by Haddad to take over the operation of the Lakewood Country Club, owned by the Land Company. She said that Haddad had decorated some of the rooms and had agreed to refurnish the club, and that he gave them three checks totaling $5,000, *402 drawn on his personal bank account, to purchase the inventory of food and liquor from the prior operator of the club, pay the prior operator the balance in the special bank account, and decorate and buy furniture so they could live at the club and rent rooms. There was received in evidence a receipt, dated January 28, 1950, acknowledging receipt of $5,000 from Haddad, signed by both the Tiernans without any identifying information for which it was given.
Haddad testified that in December 1949 both plaintiffs saw him at his New York office and said they wanted to take over and run the club. He said they asked him for $5,000 on account of the $12,000 they had advanced on their investment so they could accomplish this purpose. He advised them against investing $5,000 in such a venture, but they were determined, having been given the idea by Mrs. DeBow, so he agreed.
There was proof that in January 1950 plaintiffs received three checks totaling $5,000, drawn on Haddad's personal bank account. The checks show no evidence as to whether the $5,000 was for an advance by Haddad to pay for the decorating and furnishing of the club, as contended by Mrs. Tiernan, or a return of $5,000 on account of the $12,000 investment. Haddad testified that the $5,000 was a repayment of part of the $12,000 loan. The proceeds of the three checks were used by the plaintiffs to pay for the furniture, the inventory of food and liquor, and to reimburse the prior operator for money due him. The bills for the furniture were in Mrs. Tiernan's name and were in the sum of $1,541.75. The receipts of the club were deposited in a special account and all checks were signed only by Mrs. Tiernan. The Tiernans operated the dining room and the bar of the country club. Mrs. Tiernan testified that there was no written agreement covering their operation of the club. Haddad testified that whatever moneys were in the special account would be theirs, the inventory and "everything else." The receipts and disbursements of the club were shown in a statement submitted each month by Mrs. Tiernan to Haddad. He said the reports were made to protect the liquor license as the *403 plaintiffs operated the bar under the supervision of the country club which was owned by the Lakewood Hotel and Land Association.
Mrs. Tiernan testified that she and her husband came to Lakewood to retire, and that after operating the club for over a year, working seven days a week, Mr. Tiernan tending bar, and having made no profit, they became upset and worried, and Mr. Tiernan became ill with ulcers. During 1950 Haddad spent the weekends at the club and breakfasted with the Tiernans. Mr. Tiernan testified that in August 1950 he was concerned over his investment and said to Haddad, "And according to reports I get from you, Carasaljo Pines isn't doing well. My sister's money is invested in it." He said he was worried, aggravated and sick. Mrs. Tiernan conceded that they had made a mistake. Mr. Tiernan said that Haddad replied, "Well, if it is a matter of money, would you want to withdraw it?" Mr. Tiernan said, "Well, are there any profits?" Haddad replied, "Right now we don't show any." At this point Tiernan said that Haddad agreed that he should have his sister's money returned.
In further elaboration of the circumstances leading to the return of the $7,000, Haddad testified that in 1949 the Tiernans were in his office every weekend inquiring as to how much business Carasaljo was doing, and he replied that it "did fairly well." He stated thas Carasaljo had a net profit for 1949 of $2,200, unrealized profits on installment sales of $4,600 and unrealized profits in deferred sales of $24,000. He explained that deferred profits were subject to cancellation. However, he did not tell the Tiernans of the potential profits since the realized profits could not be determined until liquidation of Carasaljo. He also said that Carasaljo had liabilities of $22,000.
On August 25, 1950 Haddad, by his personal check to the order of the plaintiffs, returned to them $7,000 and on the same day gave them a check for $500. At the bottom of the letter agreement of April 12, 1949 there is written in Mr. Tiernan's handwriting, "Paid in full Thomas J. Tiernan, Catherine E. Tiernan Aug. 28, 1950."
*404 Plaintiffs remained in the country club from February 1, 1950 to August 1951, and when they left they received three checks to their order made by the Lakewood Hotel and Land Association. Haddad testified that plaintiffs received $2,132 in payment for the furniture, $2,237.47 for the inventory, and $1,166.39, the balance in the special account, thereby reimbursing them for their investment in the club. On August 18, 1951 when Mrs. Tiernan received the checks, she presented the club with the furniture bills and wrote on the face of them, "Received from the Lakewood Country Club $2,132.00 for the furniture bills attached including six lamps, etc. Catherine E. Tiernan, Thomas J. Tiernan, August 18, 1951."
The basic issue on this appeal is raised by the contention of the defendant that the effect of the judgment is improperly to reform the agreement of April 12, 1949 into a purchase of stock when in fact it was a loan agreement. The trial judge ruled that the transaction was a sale and not a loan and that the Tiernans became entitled to one-half of Haddad's profits in Carasaljo. The trial judge based his ruling upon his belief that the reference in the agreement of April 12, 1949 to a loan, instead of an outright sale of 25% of the stock, was for tax purposes, and that since Haddad treated the transaction as a sale of 25% of the stock to the Tiernans, it was in effect an equitable investment.
It is to be emphasized that there is no suggestion in the complaint, pretrial order, opinion or judgment of the trial court that plaintiffs are suing to reform the agreement of April 12, 1949. The court did not reform the agreement. It purported to construe it. We cannot agree with the construction of the agreement as a sale of stock. The agreement clearly speaks in terms of a loan. A loan of money is a lending, on one side, and a borrowing on the other. The conception of loaning money is well understood and the incidents pertaining to an agreement for the loan of money are few and simple: an advancement of money by the lender at the time of agreement, and a stipulation or agreement to repay it and generally with interest, at a future date, by *405 the borrower. Freeman adsm. Brittin, 17 N.J.L. 191, 231 (Sup. Ct. 1839). The fact that the provision for interest on the loan is a share of profit on an investment in lieu of a flat rate does not change the nature of the transaction as a loan.
We here find that the agreement of April 12, 1949 acknowledged the "$12,000 as a loan," with the Tiernans to have "the privilege" at any time to call their money, and, in the event the money is called within a year, for payment of 2% interest without participation in the profits of Carasaljo.
In our opinion it was error to hold that the letter agreement of April 12, 1949 was a sale rather than a loan. The agreement contains no words of a sale; what the parties bargained for was a promise that the Tiernans would receive "in lieu of interest half of my [Haddad's] profits on my investment in Carasaljo." The language of the agreement does not permit the construction that the plaintiffs acquired an equitable proprietary half-interest in the stock held by Haddad, although we do agree that they were entitled to interest in the form of a percentage of his profits pursuant to the express provisions of the agreement.
In explanation of his conclusion, the trial judge paraphrased Haddad's testimony as being "that the reason the letter referred to a loan instead of an outright sale of 25% of the stock was for tax purposes * * *." We do not find this accurate. The only reference to this is Haddad's testimony given on deposition, as follows:
"Q. And then in 1949 after operating the company for three years, you sold a twenty-five percent interest in the profits of that company to Mr. and Mrs. Tiernan? A. I didn't sell it to them. Now, I want to correct you again.
Q. Well, you borrowed money and you promised it to them? A. I told them they would get twenty-five percent of the profits, and I took that money as a loan for the $12,000 and I wanted to secure that money for them. Now, had I sold them stock it would have been another story. I would have set it up as a profit to myself. I didn't know. I guaranteed that loan for them for their own protection. I took that $12,000 as a loan.
*406 Q. In other words, what you did instead of setting it up as a stock sale, you set it up as a loan? A. Yes.
Q. And in doing that, what you were doing was saving yourself from taxes?
A. I beg your pardon?
Q. It was a tax benefit to yourself?
A. We weren't sure. When you are in a business venture you don't know whether you are going to make a profit or not."
This is not the equivalent of an admission by Haddad that the transaction was actually intended as a sale of stock but was disguised as a loan for tax purposes. It is at most supportive of the inference that because of tax considerations Haddad decided he would rather borrow the money from the Tiernans than sell them stock. Such a conclusion would not warrant recasting the transaction into something different from what the parties intended it to be, particularly in the absence of any procedural basis in the case as pleaded, pretried, or tried, for doing so.
The proofs make it most improbable that Haddad would actually have sold the Tiernans one-half of his stock interest in Carasaljo and at the same time guaranteed their investment and given them the option of selling back the stock within a year at the full purchase price plus 2% interest. A deal so favorable and one-sided from the standpoint of the Tiernans is not understandable or credible in the absence of some indication of great need for the $12,000 by Haddad in April 1949. Not only is such a need not claimed by plaintiffs to have existed, but it is unsupported by any proofs, and the trial judge expressly held to the contrary.
It is, moreover, very unlikely from the proofs concerning Haddad's financial interest in Carasaljo as of April 1949 that he would have sold outright a one-half share of his proprietorship of that company for only $12,000. By the end of 1949, according to the financial statement in evidence, the corporation had assets of $76,000, of which $57,000 was accounts receivable and $13,593.87 "land at cost." This represented apparently half the 180 acres acquired from the Land Company. Liabilities were $22,000, including $9,375 owing to Kesler. Thus, from the sale of less than half the *407 land the corporation had accumulated by the end of 1949 about $35,000 by way of excess of receivables over liabilities, including model cabins valued at $4,892. Sales for 1949 of land costing $8,161 totaled $73,848.
Moreover, as seen above, Haddad's Land Co. had been drawing generous and apparently unearned commissions on sales. The purchaser of a substantial share of the ownership of the company would have been in a position to challenge these commissions, as well as Kesler's drawings. Clearly, as of April 1949 future prospects for a substantial yield to Haddad from the corporation must have seemed promising. The probabilities are such as, in our opinion, to weigh very heavily against the likelihood that Haddad would have given the Tiernans for $12,000, not only a one-half share of such earnings for the life of Carasaljo, but also a status to challenge his and Kesler's unusual freedom of access to and manipulation of corporate funds.
For all of the stated reasons, we conclude and hold the transaction between plaintiffs and Haddad was, and was intended to be, a loan and not a sale of stock.
Having arrived at the conclusion that the transaction between the Tiernans and Haddad was a loan, not a sale of shares in the corporation, and that the disbursement by Haddad to the Tiernans in January 1950 was a repayment of the loan to the extent of $5,000, we turn to the question whether Haddad remains liable to the plaintiffs to any extent at all.
Under the letter agreement the plaintiffs were to be paid 2% interest instead of profits if they demanded their money within a year. Since $5,000 was demanded within a year, the plaintiffs were entitled to only 2% interest on $5,000 for the period of time Haddad held it. As to the $7,000 which was not paid until August 1950, plaintiffs would be entitled to seven-twelfths of one-half of Haddad's share of the profits of the corporation accrued from the date of the loan until August 1950. What such profit may be can be determined only by an accounting of the operations of Carasaljo during that period. Defendant will be entitled on *408 the accounting to credit for the $500 which he gave the plaintiffs as the supposed stipulated share of profits. Plaintiffs are entitled to such an accounting in view of the confidential relationship which existed between them and Haddad, as found by the trial court, with which finding we agree, and Haddad's failure to disclose to them all the facts concerning the corporate financial status.
Haddad argues that there did not exist any confidential relationship, in the sense discussed above. We agree that generally cestuis que trust are not of such a kind as the Tiernans, in situations where the courts have seen fit to impose the relationship not otherwise expressed between the parties. However, this does not prevent the exercise of equity powers where the pervading atmosphere as established by the proofs points to a relationship of trust and confidence.
It is a well recognized rule that one who undertakes to act for another in a matter of trust and confidence, whether he acts gratuitously or for compensation, is under a duty not to act contrary to the interests of the one relying upon his integrity. It is a duty created for the purpose of protecting the confiding interest and is in harmony with sound public policy. Wright v. Smith, 23 N.J. Eq. 106 (Ch. 1872); Thalman v. Canon, 24 N.J. Eq. 127 (Ch. 1873); Rodgers v. Genung, 76 N.J. Eq. 306 (E. & A. 1909); Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (Ct. App. 1928); 2 Scott on Trusts (1939), § 170.25, p. 909.
The facts as disclosed by the proofs clearly indicate that Haddad for many years was a real estate operator of considerable experience. The Tiernans had known him for five years prior to their turning over the $12,000 to him in 1949. They had bought and sold lots through his office, and they discussed with him the purchase and sale of Western Union stock. Carasaljo had paid commissions to Mr. Tiernan for the sale of lots. The trial judge held that Haddad was a "gratuitous trustee of the interests" of the Tiernans in Carasaljo. Haddad discouraged the Tiernans from purchasing 100 acres of vacant land, which, although it may have *409 been sound advice, nevertheless is indicative of the reliance they placed upon his judgment. There is abundant evidence supporting the trial judge's determination of the relationship of confidence between the parties. We are not disposed to disregard this conclusion.
It follows directly that there is attendant upon this relationship a duty of full disclosure and fair dealing. Norris v. Beyer, 124 N.J. Eq. 284, 289 (E. & A. 1938); Campana v. Angelini, 132 N.J. Eq. 285 (Ch. 1942); Restatement, Trusts, § 170, p. 431. The trial judge determined that Haddad had breached his obligation of full disclosure, although "unintentionally," by failing to disclose the true financial status of Carasaljo in 1950. He did find, however, that there was no breach of the duty of fair dealing or any intentional misleading of the plaintiffs.
The trial court's conclusion that the original transaction between plaintiffs and Haddad was a sale of a stock interest rather than a loan led it to conclude that plaintiffs should have an accounting as to the profits of Carasaljo, apparently down to date, upon depositing the $12,000 repaid them. Our determination, as outlined above, would preclude any accounting beyond the August 1950 date when the $7,000 loan balance was repaid. There are sound reasons why this limitation should be imposed.
Viewing the relationship between the Tiernans and Haddad as of August 1950 as that of lender and borrower to the extent of $7,000, Haddad possessed the right to pay off the debt, regardless of the consent of the plaintiffs, there being nothing in the agreement to the contrary. 70 C.J.S. Payment § 5, p. 216; Diehl v. Council of Zion Evangelical Lutheran Church, 162 Pa. Super. 167, 56 A.2d 113, 115 (Super. Ct. 1948). Consequently, Haddad cannot be said to have unjustly deprived plaintiffs of a right to continuation of their loan at the interest rate of 25% (or seven-twelfths thereof) of the future accruing profits of the corporation, since no such right existed as against an election by Haddad to pay off the loan.
*410 Second, Haddad's withholding from plaintiffs in August 1950 of the true financial condition of Carasaljo, as held to be a fact by the trial court, became legally immaterial in view of the court's express finding of fact that the Tiernans would have elected to withdraw their $7,000 even had Haddad made a full disclosure to them of all the facts respecting Carasaljo. We agree with the finding of fact. The Tiernans needed and wanted the money at once. Prospects for realizing profits in the future were problematical. Thus, it being found that the Tiernans would have called their loan in August 1950 regardless of Haddad's breach of duty to disclose all the corporate information to them, that breach caused them no loss.
It will be recalled that the trial court found no bad faith on the part of Haddad, but only a technical breach of his duty of full disclosure. In the absence of bad faith or self-dealing the present tendency is to restrict the liability of the trustee to breaches of duty which result in loss to the cestui, 2 Scott, Trusts (1939), § 204, p. 1096, unless the breach is of such a character that it is felt necessary to impose an absolute liability on the trustee in order to deter trustees generally from committing similar breaches of trust. See also Restatement, Trusts, § 205, p. 553; § 179, p. 459, comment (d), p. 459; § 209, comment (b), p. 575; § 211, comment (d), p. 582; Beam v. Paterson Safe Deposit and Trust Co., 83 N.J. Eq. 628 (E. & A. 1914). In the instant case, in view of Haddad's right to pay off the loan at any time, we do not see any justification for holding him responsible for interest subsequent to August 1950 which the approved findings of fact in this case demonstrate the Tiernans would never have waited for even if Haddad had complied with his duty of full disclosure.
We must, finally, determine whether plaintiffs should be barred from the limited relief we have ordered in their favor by the doctrines of laches and unclean hands.
As to laches, we note first that the invocation of this rule requires a showing that the lapse of time has prejudiced the party claiming its benefits. Montclair Trust Co. v. *411 Star Co., 139 N.J. Eq. 211, 216 (Ch. 1947) affirmed 141 N.J. Eq. 263 (E. & A. 1947); Mitchell v. Alfred Hofmann, Inc., 48 N.J. Super. 396, 403 (App. Div. 1958) certification denied 26 N.J. 303 (1958); 2 Pomeroy's Equity Jurisprudence (5th ed. 1941), § 419d, pp. 177, 179. We perceive no evidence of prejudice here in the defendant's being required to disclose the information relative to Carasaljo's profits between April 1950 and August 1951. There may be inconvenience but inconvenience is not prejudice in the sense presently material.
The defense of unclean hands has no basis in the facts as we have found them. If we were acceding to plaintiffs' contention that the original transaction was a sale, not a loan, the applicability of the rule might be colorable on the basis that plaintiffs conspired to mask a sale as a loan to assist the defendant in avoiding taxes. But such a basis for invoking the defense disappears with our rejection of the finding of a sale. In any event, the most recent authorities disallow the defense where the wrongdoer would be permitted "an unconscionable gain * * * at the complainant's expense." A. Hollander & Son, Inc., v. Imperial Fur Blending Corp., 2 N.J. 235, 247 (1949); Medical Fabrics Co. v. D.C. McLintock Co., 12 N.J. Super. 177, 180 (App. Div. 1951).
The judgment is reversed and the cause remanded to be further proceeded with conformably with this opinion. No costs.